(47·South. 508.)

No. 17,197.

STATE v. PAMELIA.

(Oct. 19, 1908. Rehearing Denied Nov. 16, 1908.)

1. CRIMINAL LAW (§ 1156*)—APPEAL—REFUSAL OF NEW TRIAL.

When the trial judge in a criminal case refuses an application for a new trial which is based upon testimony alleged to be newly discovered evidence, his refusal cannot be set aside on appeal when the object of that testimony is to weaken or destroy that taken on the trial, of which the trial court has knowledge and the Supreme Court has not.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3069; Dec. Dig. § 1156.*]

2. CRIMINAL LAW (§ 519*)—CONFESSIONS—ADMISSIBILITY.

Statements of a person as to his connection with a crime, made when he is taken under arrest to the police station charged with that crime, are admissible against him in evidence, though made under great excitement and nervousness, if voluntarily made.

[Ed. Note.—for other cases, see Criminal Law, Cent. Dig. § 1167; Dec. Dig. § 519.*].

(Syllabus by the Court.)

Appeal from Criminal District Court, Parish of Orleans; Joshua G. Baker, Judge.

Alberto Pamelia was convicted of felony, and appeals. Affirmed.

John Quincy Flynn, for appellant. Walter Guion, Atty. Gen., James Porter Parker, Dist. Atty., and Samuel Alexander Montgomery, Asst. Dist. Atty. (Chandler Clement Luzenberg, of counsel), for the State.

NICHOLLS, J. The defendant (Alberto Pamelia) was indicted jointly with one Joseph Monfre charged with having on the 6th day of December, 1907, in the nighttime, maliciously and feloniously exploded a certain explosive substance with the felonious intent in so doing to destroy a house situated on South Claiborne street in the city of New Orleans, bearing the municipal number 241, in which house there were at the time human beings, namely, one Carmello Graffagnini and his wife, usually staying and residing, and who on the said night were actually in the said house, and the said exploding with the said intent was contrary to the form of the statute of the state of Louisiana in such case made and provided, and against the peace and dignity of the same.

The accused were each arraigned, and each pleaded not guilty.

On motion of the state a severance of trial was granted, and Pamelia was subsequently tried on the charge, and having been found guilty was sentenced to imprisonment in the state penitentiary at hard labor for 20 years. He has appealed from the verdict and the sentence.

A bill of exception taken during the trial recites that during the trial while a witness, John Loyocano, was on the stand testifying, the following question was asked by the district attorney:

"Q. At what time did the accused make any statement—did he say anything about himself or this offense?"

To which question and the answer counsel for defendant objected, on the ground that previously and immediately preceding this event the accused had been taken into custody by a party of unauthorized persons, subjected to threats and ill usage of such a nature as to place defendant in bodily fear and terror; that any statement made by defendant under such circumstances was inadmissible; that a proper foundation for the introduction of such evidence had not been laid.

Whereupon, instructed by the court, witness was examined as to the conditions existing at the time, and one Graffagnini was also examined to the same effect. The court thereupon, ruled the evidence admissible, and the witness was instructed to answer.

Counsel for defendant then excepted to said ruling, and reserved his bill of exceptions making the evidence a part of said bill, tendering the bill for signature.

On this bill, the assistant district attorney wrote:

"All the testimony as to the laying of the foundation for the confession, together with all the testimony as to the confession itself, should be made a part of the bill and go up with the record."

To the bill the judge added:

"I am of course satisfied that this testimony was admissible, and that the proper foundation had been laid. All of the testimony is made part of the bill."

The jury having returned a verdict of guilty, Pamelia moved for a new trial. The district judge overruled this motion, and defendant has filed a bill of exceptions thereto. In the motion for a new trial it was recited that since the trial of the case defendant had come to his knowledge of a witness who on oath declared that he was present at the time the explosion took place; that he was the one mentioned in the evidence of Mrs. Reilly as barkeeper of the saloon at the corner of Tulane avenue and Claiborne street, and who was said to have spoken to the man going up Claiborne street towards Tulane avenue, and identified by her as Pamelia; that he did not and does not identify Pamelia as the man spoken to by him on that night; that he was positive that he was not the same man, and that Mrs. Reilly, to the best of her ability, was mistaken in her identification; that said defendant was positive that he could identify the man if he saw him, but that said Pamelia is not the man seen by him and spoken to by him on said night; that the witness Maggio was mistaken, as evidenced by the statement of Mrs. Reilly, when he says that he saw Monfre with three other men on the corner of Palmyra and Claiborne streets, as Mrs. Reilly says positively that a man resembling Monfre was standing half an hour before at the saloon corner of Tulane avenue and Claiborne streets. Again, this witness, Rosebits, says that he did not see any one pass through the market on or at the end of the market immediately before or after the explosion. If this be true, the man seen by Mrs. Reilly could not have come from Graffagnini's grocery store.

The bill of exceptions merely recites that the application for a new trial being on hearing, and the evidence of one Samuel Vaslich having been heard, the court overruled the application, and defendant reserved a bill which he tendered for signature, making the evidence part of the bill. The judge signed the bill, making no comment upon the testimony. In order to be able to reach any conclusion as to whether the judge properly refused the application for a new trial or not, we would have to know what the testimony was upon the trial, so as to be able to see what effect should be given to the testimony of Vaslich in its bearing upon the testimony of the other witnesses in the case. Vaslich's testimony was offered to the judge, who had full knowledge of the whole testimony in the case. This court has knowledge of no other testimony than that of Vaslich, and can form no idea of or conclusion upon the weight of and effect to be given to it. This court is not in position to override the conclusions of the judge on that subject. His ruling of the application for a new trial must remain undisturbed.

On the trial of the case, the state was permitted to establish, over defendant's exception, that he had made a confession that he had committed the act charged. It is asserted that when this confession was made he was in such a condition of bodily fear and terror that any statement made by him under such conditions was inadmissible; that, previously and immediately preceding the statement he made, defendant had been taken in custody by a party of unauthorized persons, subjected to threats of ill usage of such a nature as to place defendant in bodily fear and terror. This claim is sought to be

sustained by a witness of the name of Loyocano and by that of Graffagnini. From Loyocano's testimony we learn that the defendant and a young brother were arrested by Capt. Doyle of the police at Pamelia's house at 9:30 o'clock at night. That they were being taken to the police station by Capt. Doyle and Detectives Littleton, Dantonio, and Deane; that Capt. Doyle was walking behind the prisoners; that he said nothing to them, nor did the other officers; that there were no threats nor personal violence offered of any character to make Pamelia make the statement he did. He was much excited, and the young brother was trying to quiet him. He was much excited that the young brother should have been placed under arrest. Some one had Alberto Pamelia by the arm, and he seized his hat and threw it on the ground, and then he was asked: "Who had done it?" and he said, "Why do you want to arrest that boy?" (meaning his brother). He threw his hat on the ground and said he done it, and that his brother knew nothing about it.

Mr. Graffagnini was there, and he heard (Loyocano) a short conversation between Pamelia and Graffagnini. Pamelia said to the former:

"Kill me; I am the one who done it. My brother has nothing to do with that."

He was very much excited, and he said:

"I done it; I done it; kill me; don't kill my brother. Don't take me to the station. Kill me now; I done it. My brother knew nothing about it."

Graffagnini was there, and Pamelia's brother was there, and this man (Pamelia) was raving he was so excited, and Graffagnini said, "I can quiet him," and then his brother took him by the arm, and between them he commenced to talk. The detectives took him by the arm; they took him by the arm to quiet him. Then he told Graffagnini. Graffagnini told Pamelia:

"Why don't you tell the truth in this case? Why did you want to do that to us? Come on, why did you want to destroy my family?"

And then Pamelia took his hat off his head and threw it on the ground. He commenced to rave and he was excited, and he hollered, "Why don't you kill me?" He said he didn't do it (meaning his brother). He says:

"I done it. Why don't you kill me? This boy had nothing to do with it. Kill me; kill me."

Graffagnini told him it was not a question of killing him—he wanted to know the truth.

Graffagnini, being placed on the stand by the state, was asked by the district attorney:

"Q. When you went down to make the arrest of Pamelia, you went to his house with Capt. Doyle?
"A. Yes, sir.
"Q. Do you recollect stating to Capt. Doyle at the time that you left this man in his hands, and then you said, 'Leave him to me.'
"A. Well, he kept on making all this noise, and I said, 'Leave him to me. He ain't going to run away, and I can quiet him.'
"Q. Were you and your brother on one side?
"A. Only myself. I was on one side, and my brother was back of him with Mr. Loyocano.
"Q. Then he asked you what you were going to do with him?
"A. Yes, he did; and I told him we were going to bring him to the station. I asked him why he did that last night, and he said, 'Kill me; don't bring me to the station.'
"Q. Did you say what you were going to do with him then?
"A. No, sir.

"Cross-Examination.

"Q. Now, in the lower court did you say that you would bring him to the station, and maybe they would hang him there?
"A. He said, 'What are you going to do with me? Are you going to hang me?' and I said, 'I don't know anything about that.'
"Q. Did you testify in the lower court to that effect?
"A. He said, 'What are you going to do with me?' I says, 'I don't know; maybe they will hang you;' and he said, 'Please kill me.'
"Q. Is that correct?"
(No answer.)
"Q. Did you testify to that in the lower court?
"A. Maybe; I don't know; I ain't sure. I can't say what he told me this night, what I told him for sure.
"Q. Were you all armed when you went down there? Did you have guns on you?
"A. No, sir; I had no gun.
"Q. Were there any guns?
"A. I didn't see any guns.
"Q. Was there any one with guns in their hands that you saw?

STATE v. PAMELIA.

"A. No, sir.

"Q. Did you make any threats?

"A. No, sir; I made no threats. I did see two guns he had there."

Loyocano, being recalled, was asked by the district attorney.

"Q. Did the accused make any statement in regard to this matter as you walked away?

"A. Yes, sir, he did.

"Q. What language did he speak it?

"A. He spoke in the Arborish Greek language.

"Q. Do you speak it?

"A. Yes, sir.

"Q. In your presence was anything said or done to these men to make them make the statement?

"A. No, sir.

"Q. Nothing whatever?

"A. No, sir, nothing whatever.

"Q. Now, what did he say?

"A. He threw his hat on the ground in a very excited manner."

"By the Court: I think the fair way would be for him to state how the statement came about. State what happened.

"By Mr. Montgomery, assistant district attorney:

"Q. You were walking with him?

"A. Yes, sir, Capt. Doyle, Judge Patorno, Detectives Lucas, Dantonio, and the two Graffagnini.

"Q. Who had hold of him?

"A. The detectives had hold of him at first, and he was in such frightful (frightened) condition that the two Graffagnini said, 'Let us handle him; we know him, and we know how we can keep him quiet;' so one of the Graffagnini had him by the arm and one by the other arm, and they told him—they said, 'Now, Pamelia Alberto, why don't you tell us why did you do this thing? Why did you do it? What did you want to kill us for? Why did you want to kill me for? Tell us why you done it.' Pamelia he takes off his hat—he was very excited—and he throws it down to the sidewalk, and then he was badly excited, and he said—he stamped the ground and said—'Kill me if you want to.' He said: 'Yes, I done it,' or words to that effect. He said, 'Why do you arrest my brother? He didn't have anything to do with it. He's a little boy. He didn't do nothing. Kill me. I am the man. I did it. What do you want to bring this poor boy to jail? Let him alone. I done it. Kill me.' He was very much excited. His looks were trembling. This last I judge about 10 minutes at least—this excited condition."

The court ruled the testimony admissible.

The syllabus of the brief of the counsel of appellant reads as follows:

1. Statements made under duress and while the accused is in evident fear of his life, and while the prisoner is held without warrant of law by an unauthorized mob, are inadmissible.

2. Statements made under great excitement, and while a person is laboring under evident fear of his life or bodily harm, and when the persons detaining or holding said prisoner do so without a warrant in the middle of the night under circumstances calculated to induce fear, are to be received with great caution and are clearly inadmissible.

3. There is nothing in the record going to show that the appellant was arrested at his house without a warrant in the middle of the night by a mob, and that he made the confession referred to when in their hands and under the circumstances calculated to induce fear that his life was in danger. He was unquestionably very much excited when he made the statement attributed to him. The only matter before us touching these statements is whether (whatever they may have been) they were made under such circumstances as to be admissible in evidence; what he said, and what effect should be given to it, were matters for the jury. Counsel for the state urges that a confession is not deprived of its character of a voluntary statement that it was made under excitement and while in a state of great nervousness, citing State v. Jones, 47 La. Ann. 1531, 18 South. 515. That advice given by one to tell the truth does not make a confession voluntary. State v. Alphonse, 34 La. Ann. 19; State v. Meekins, 41 La. Ann. 545, 6 South. 822. They say what worried the defendant was not his being arrested for a crime of which he knew he was guilty, but the fact that his innocent brother might also be placed in prison. We think the court was warranted in allowing his statements to be introduced in evidence.

Finding no reversible error, the judgment is affirmed.