State vs. Berry.

No. 12,950.

STATE OF LOUISIANA VS. JOE BERRY.

Before. what purports to be the confession of an accused person can be intro- duced in evi\< ence against him, it should have been shown to have been freely and voluntarily made and not brought about by fear on his part, or induce- ments held out to him.

The mere fact itself that the confession was made while under arrest or imprison- ment to the officer of the law arresting him or holding him in custody does not take from it the character of a free and voluntary confession.

A prisoner's confession to the officer arresting him or holding him in custody, will not be rejected merely because it was made in answer to a question which assumed his guilt.

The mere fact of the intoxication of the prisoner (not amounting to mania), at the time of his making a confession to the officer arresting him or having him in custody, does not exclude the confession. Confession, however, pro- duced by intoxication, is a fact for the jury tending to discredit a confession.

Confessions made by prisoners to parties arresting them or holding them in cus- tody should be closely scrutinized by the courts to make certain that instru- mentalities intended merely for the vindication of the law should not be converted into engines of oppression and wrong.

ON APPEAL from the Ninth Judicial District Court for the Parish of De Soto. *Hall, J.*

*M. J. Cunningham*, Attorney General, and *J. B. Lee*, District At- torney, for Plaintiff and Appellee.

*Wm. Goss* for Defendant, Appellant.

Submitted on briefs November 26, 1898.

Opinion handed down December 5, 1898.

---

The opinion of the court was delivered by

NICHOLLLS, C. J. Appellant was convicted of murder without capi-. tal punishment, sentenced to life imprisonment in the penitentiary, and from the sentence he has prosecuted this appeal.

The only question submitted to us for review is the action of the District Court in permitting a confession of the defendant to go to the jury, over the protest of the latter.

It was claimed by the defendant that the confession was not free and voluntary.

The testimony which served as the basis for the introduction of the confession is annexed to the bill as part thereof, and is as follows:

C. W. Smith, sworn, says:

" I am the constable of Ward 5, and arrested the accused. I found him at Mr. Airy's, about five or six miles from the scene of the homicide, about 10 or 11 o'clock at night. He made a statement to me in regard to the killing. It was a free and voluntary statement on his part. I offered him no inducement whatever for making the statement. I did not tell him that it would be better for him to make a statement. I did not tell him he would get out lighter if he made a statement. I made no threat or offered no violence against him to induce him to make a statement. I had him under arrest at the time, and he voluntarily made the statement to me without any inducements or threats of any kind.

" He made me a statement at the time he was first arrested, and he made me a subsequent statement at the house where the homicide was committed. At neither time did I offer any inducement, or threaten him, or tell him, it would be better for him to make a statement. Both statements referred to were free and voluntary on his part."

Cross-examined:

" Mr. Jim Bice, Jr., went with me to arrest him. I was armed with a shotgun and a pistol. Mr. Bice had a pistol. I think I found him about 10 or 11 o'clock at Mr. Airey's. The first words I told him was to hold up his hands, which he did. I asked him ' Why did you do it?' I tied him with a rope. · The first words he said after I

told him to hold up his hands were: 'Who in the hell told you about it?' I asked him, 'what on earth he meant by killing Will?' I think it was about the time we went up to him. When I got to Mr. Airey's I got over in the cowpen, between where Joe's horse was unhitched and the house. Before I got over in the cowpen I heard them talking coming down where Joe's horse was, and recognized Joe's voice and got over in the cowpen. I don't know but what there was a lane leading to the house, and Joe was coming down beside the fence, and Mr. Airey was with him. When I heard Leon Airey tell Joe that he heard somebody, I then went up to the fence where they were as quick as I could, and drew my gun on him, and told him to throw up his hands. He threw up one, and I told him to throw up the other, and he done that. I think I told him that if he didn't throw up the other I would shoot him. I then got over the fence as quick as I could and tied him, and then searched him. I think he asked me the question: 'Who in the hell told you?' before I had gotten to him. It was just after this that I asked him why he had killed his brother, and in reply to what he had said, and it was then that he began to make the statement to me about how and why he had done it. He substantially made the same statement to me a number of times after that. Leon Airey went back in the house, and his father, Victor Airey, came out to where we were and asked what was the matter, and Berry replied: 'I told you I had killed the damned scoundrel,' or 'damn son of a bitch.' I don't recollect which epithet he used. (Defence objects and reserves a bill.) I remained with him at Mr. Airey's about half an hour. He made no further statement differing from the first he told me at that time. I went back with him to his (Berry's) house. I had him tied all the time. I suppose it was after 12 o'clock when I got back to his house. He made pretty much the same statement to me several times. We would ask questions along, and he would answer, until he thought he had answered enough, and would then say he would wait and see what Carrie would say about it. Carrie was his wife. He went to bed after he got to my house. It was probably 2 or 3 o'clock when he got to my house. Jim Bice was with me. I tied his hands behind him and tied his feet under the horse while he was riding. I loosed his hands from behind him and tied them down by his side after I got to my house. I came on to town with him next morning, and left my house probably at 8 or 9 o'clock. J.

J. Vealock came to town with me and him. I got there a little after 12. I don't know that he made any further statements to me between my house and town. The next morning at my house, after Berry woke up, my brother Frank asked him how he felt, and if he realized what he had done the night before; and Berry replied that he couldn't realize what he had done, and said he didn't believe he had killed Willie, and then said: 'I have talked too damned much now for my own good. I will wait and see what Carrie says.' When I arrested him I saw some indications that he was under the influence of liquor. He did not seem to be excited or scared when I was tying him. The moon was shining very bright when he was talking to me. I could see plainly who he was twenty steps off. I didn't tell him that he had better tell about it, or that it would be better for him to tell about it. As soon as I got to him after throwing my gun on him he began to make a statement. The first statement made was in answer to my question as to why he had killed his brother."

Re-examined:

"Mr. Berry knew me well, and knew I was the constable of the ward. I had only one man with me. Berry did not seem at all frigthened and seemed like he didn't care for anything. I suppose Mr. Berry is about thirty-five years old and passes for a white man."

Recross-examined:

"I always try to arrest everybody down there that I have a warrant for. I have never let one get away yet that I know of."

Defendant's counsel calls attention to the fact " that during all the time he was making the confession he was securely tied with his hands bound behind or at his side." He calls attention to the following statement by Smith at the close of his cross-examination. "As soon as I got to him, after throwing my gun on him, he began to make a statement. The first statement made was in answer to my question as to why he had killed his brother."

In the brief filed for defendant his counsel says: The accused begins his statement in answer to a question asked by a constable acting as deputy sheriff, while the deputy had his gun leveled at him and the statement was continued while accused was being tied and while under arrest. Smith's testimony shows that the prisoner's captors were plying him with questions which he answered reluc-

tantly. Smith says: "We would ask him questions along and he would answer until he thought he had answered enough." It will be observed this deputy undertook to tell what the prisoner thought thereby indicating that his captors were pressing him for a fuller confession. It will also be noticed that Smith assumes in his first question that the accused did kill his brother, for he says: "I asked him why he had killed his brother?"

We do not understand the witness Smith to say that the statement of the accused was made to him in response to a question, "why he had killed his brother?" propounded to him simultaneously with the leveling of the constable's gun at him, and while it was so leveled upon him. Had this been the situation; it might well be said that the answer was made under duress, while under the influence and fear of the gun directed against him. What the constable said was "that he threw (leveled) his gun at Berry, calling twice upon him to throw up his hands; that after this had been so, he climbed over the fence, advanced upon and arrested the defendant." The object of the leveling of the gun was evidently to ensure the constable's safety while moving up to Berry, and not to call threateningly for an answer to a question asked. The constable says that Berry "began to make the statement as soon as he (the constable) got to him, after throwing the gun, and not while throwing the gun on him. Parties making dangerous arrests are not apt to initiate proceedings by asking questions. A fair construction of the language of the witness is that the conversation between the parties occurred just as or just after the constable had reached defendant, and it is from that standpoint we must test matters. There is no claim that the tone of Smith's voice in asking the question he did of the defendant was threatening, or indicated any hostile feeling toward him. Two persons (Bice and Airey) were present, besides Smith, and defendant was in position to have shown anything like coercion, had such existed, by the testimony of one or the other, or both. It is unquestionable that before what purports to be the confession of a person accused of crime is introduced in evidence it must be shown that it was free and voluntary; not made under the influence of fear, inducements or promises. It has been held by this and other courts that the mere fact that the confession was made while under arrest or imprisonment to the party or parties arresting him or holding him in legal cus-

83

tody is not sufficient ground *per se* to take from the confession the character of its being free and voluntary. A confession made under such circumstances and shown affirmatively by testimony to have been made without intimidation, threats, menaces or inducements on the part of the officer of the law is admissible. State vs. Hash, 12 An. 895; State vs. Monie, 36 An. 513; State vs. Alphonse, 34 An. 18; State vs. Magee, 36 An. 309; State vs. Meekins. 41 An. 545; State vs. Hamilton, 42 An. 1205; State vs. Johnson, 47 An. 1230; State vs. Lewis, 39 An. 1111; State vs. Demareste, 41 An. 617; State vs. Chambers, 45 An. 37.

The fact that a confession was made to such persons and under such circumstances throws upon courts the duty of very closely scrutinizing the conduct of those officials and making sure that the instrumentalities intended merely for the vindication of the law should not be converted into engines of oppression or wrong. We find nothing in this case to break the force of Smith's declarations, under oath, that the statements made to him were free and voluntary, brought about by neither fear nor inducements. The facts disclosed by the testimony that Berry when arrested was under the influence of liquor furnishes a probable reason for his having so indiscreetly and injudiciously acted so far as his own interests were concerned.

Neither the fact of defendant's partial intoxication, nor that of his statements being made in response to question asked of him (State vs. Allen, 37 An. 687; State vs. Taswell, 30 An. 886; State vs. McGee, 36 An. 209), furnish in law legal grounds for excluding the confession, though they may affect its weight when before the jury. The following extracts taken from Wharton's Criminal Evidence (9th Ed.) bear directly on the issues raised in this case.

Section 649: "Confessions made to constables or other arresting parties, or to magistrates, can not be excluded unless it appears that there was a threat of harm or a premise of worldly advantage employed by an authoritative person." R. vs. Baldry, 12 Am. & Eng. L. and Eq. 591; 5 Cox. C. C. 528; 2 Ben. C. C. 430; Com. vs. Sturtivant, 117 Mass. 122; Com. vs. Smith, 119 Mass. 305; Murphy vs. People, 63 N. Y. 590; Wolf vs. Com., 30 Grat. 833; Aaron vs. State, 37 Ala. 106; State vs. Carlisle, 57 Mo. 102; State vs. Bruce, 33 La. An. 186; State vs. Staley, 14 Minn. 105; State vs. McLaughlin, 44 Iowa, 83; State vs. Ingram, 16 Kas. 14.

Section 661:  " When  a party is  compelled by duress to make a self-disserving statement, this statement can not be put in evidence against him.   Legal imprisonment, however, does not operate to exclude a confession  made  during its continuance when no threats or promises are used.  ·Thus, when a prisoner  after his  arrest, upon being interrogated, why he had killed his wife,  replied:  ' Because I loved her,' and said further, ' I killed her because she loved another better than me,'  and  also  said to a  fellow-prisoner in jail, that he had killed her, but if it was to do  again, he would not do  it; it was held  that  there was nothing in the  circumstances under which the confession was made to render them  inadmissible.    State vs. Free-man, 1 Speers 57.    That the  prisoner's feet were  tied does not ex-clude.    State vs. Patterson, 73 Mo. 695."

Section 662:

" A confession is admissible when  voluntarily made to the public officer, even  though the prisoner be in custody  of  such officer, unless  the confession be in some sense  elicited by threats or prom-ises."    Numerous authorities cited.

Section 663:

" A prisoner's  confession will not be rejected as  evidence merely because it was made in answer to a question which assumed his guilt. Thus, where  the  officer who committed  the prisoner on a  charge  of murder, asked ' whether if  it was to do over again, he would do  it,' and the reply was, 'Yes sir-ree, Bob,' it was held that both the ques-tion and answer were admissible in evidence, as well as the fact that in making the reply the prisoner's ' manner was short.' "   Carroll vs. State, 23 Ala. 29, and numerous other authorities.

Section 676:

" The mere fact of  intoxication, unless  amounting to mania, does not exclude a confession made during its continuance, even  though the intoxication was  induced by a police officer who sought in this way to lead the prisoner to confess.    Confession, however, produced by intoxication is a fact for the jury tending to  discredit a  confes-sion."    (Authorities cited.)

We find no basis for holding that the proceedings of the case, the verdict of the jury and the sentence of the court were not in accord-ance with law and evidence.

The  judgment  of  the  District  Court  must be  and  it is hereby affirmed.