(84 South. 315)

No. 23776.

STATE v. DOYLE.

(Jan. 5, 1920. On Rehearing, April 5, 1920.)

*(Syllabus by the Court.)*

1. CRIMINAL LAW &=531(3) — CONFESSION HELD NOT INADMISSIBLE AS OBTAINED THROUGH DURESS AND VIOLENCE.

An objection, reserved by a defendant on trial under an indictment for murder, to the admission in evidence of a confession, upon the ground that it was obtained through duress and violence, is properly overruled, when the evidence (made part of the bill of exception) shows affirmatively that it has no other support than the fact that the confession was made while the defendant was in the custody of the police, and after repeated examinations by the superintendent, in an office which was open to the public and was constantly visited by the representatives of the daily papers of a large city, and during which examinations no promise or threat was made to educe the confession, and defendant was made physically comfortable, and supplied with food, coffee, cigars, and cigarettes, was at all times in perfect control of his faculties, and made a confession which is intelligent, consecutive, detailed, and fluent, and is confirmed by facts included therein, and otherwise thereafter established; there appearing nothing in the situation to warrant the belief that he was induced by hope or fear to confess himself guilty of an offense punishable with .death, if such confession were untrue, but, to the contrary, much to satisfy the mind, that he could not, for lack of information, have made the confession as it was made unless it were true.

2. CRIMINAL LAW &=520(2)—THE PROPER INQUIRY IN EXCLUDING CONFESSIONS IS WHETHER THERE WAS SUCH INDUCEMENT AS TO MAKE A FAIR RISK OF A FALSE CONFESSION.

The underlying and fundamental principle which is to be applied in excluding confessions is that, under certain conditions, they may be untrustworthy as evidence, and the proper inquiry in such cases is: Was the inducement such as that there was any fair risk of a false confession?

On Rehearing.

*(Additional Syllabus by Editorial Staff.)*

3. CRIMINAL LAW &=517(1) — INCRIMINATING EVIDENCE GUARANTY DOES NOT CHANGE RULE AS TO ADMISSIBILITY OF CONFESSIONS.

The constitutional provision that no person shall be compelled to give evidence against himself in a criminal case or in any proceeding that may subject him to criminal prosecution is not intended to bring any change in the law of evidence as to the admissibility of confessions, and now, as before, the admissibility of a confession depends upon whether it was voluntary.

4. CRIMINAL LAW &=519(9)—CONFESSION TO POLICE OFFICER WHILE UNDER ARREST MAY BE ADMISSIBLE.

The fact that a confession was made while under arrest and in answer to questions propounded by a police officer does not render it inadmissible so long as it was voluntary.

5. CRIMINAL LAW &=518(1)—VOLUNTARY CONFESSION WITHOUT CAUTION IS ADMISSIBLE.

In the absence of a statute requiring caution or warning, the fact that voluntary confes-

sion was made by accused without having been cautioned or warned that it might be used against him does not affect its admissibility.

6. CRIMINAL LAW ⊙═532(½) — VOLUNTARY CHARACTER OF CONFESSION DETERMINED BY CIRCUMSTANCES.

The sole question is whether a confession sought to be offered in evidence has been free and voluntary, which question is to be determined exclusively by taking into consideration the circumstances of the making of the confession.

7. CRIMINAL LAW ⊙═517(1) — CONFESSION MUST NOT HAVE BEEN RESULT OF COMPULSION.

All that the law requires is that the confession offered in evidence should not have been the result of compulsion, either physical or moral.

O'Niell and Dawkins, JJ., dissenting.

Appeal from Criminal District Court, Parish of Orleans; Joshua G. Baker, Judge.

Edward C. Doyle was convicted of murder and sentenced to death, and he appeals. Affirmed.

Ulic J. Burke and Richard Wingrave, both of New Orleans, for appellant.

A. V. Coco, Atty. Gen., and Chandler C. Luzenberg, Dist. Atty., and A. D. Henriques, Asst. Dist. Atty., both of New Orleans (St. Clair Adams, of New Orleans, of counsel), for the State.

### Statement of the Case.

MONROE, C. J. The bills of exception disclosed by the transcript in this case do not, as a rule, state the grounds of the objections reserved by them, but refer to the "entire record" (including all the evidence adduced and the notes of evidence), which is made part of each bill; and the bill and record, taken together, show that the sole ground of objection urged on the trial to the admission of the confession was that "it was obtained under duress and violence." They fail, however, to show that the accused was questioned and cross-questioned by the superintendent, and perhaps by other police officers attending the examinations, "during a period of 45 or 48 of the 53 or 54 hours that elapsed from the time of the arrest of the accused until he confessed having committed the crime," or that the doctrine of self-incrimination by confession was ever mentioned, or that the superintendent told the accused that he had evidence enough in two capital cases to hang him, or that a lawyer advised the superintendent, in the presence and hearing of Doyle, that a man could be hanged for entering a house armed with a deadly weapon, "all in connection with the superintendent's persuading and importuning Doyle to confess that he had committed the murder of which he was accused," or that the defendant was given to understand, if in fact he was not told, "that his only means of putting an end to the ordeal was to make the confession demanded of him."

The testimony shows that Levy and Gainsburg, citizens of New Orleans, having attended a meeting of an organization of which they were members, walked together down St. Charles avenue to Calliope street, and into that street, at about 9:45 o'clock on the night of Friday, May 9, 1919; that at some point between St. Charles avenue and Carondelet street Gainsburg, who was nearer the curb, was tapped on the shoulder from the rear, and, turning, found himself faced by a man who was holding a "gun" (meaning a pistol), and who gave the command "hands up," which he and Levy, who had also faced about, at once obeyed; that Levy was carrying a small, light, fancy cane, and that, when Gainsburg, addressing him, said, "Hit him," he struck the barrel of the pistol, held by the man, with the cane, which was thereby broken in two, and the pistol, either at that instant, or, as is more probable, an instant before, was discharged, inflicting a wound upon Levy of which he died on the spot; that the man, after hesitating a moment, ran out Calliope street towards Carondelet, down Carondelet

towards Howard avenue, and across Howard avenue to its junction with Baronne and St. Joseph streets, where he disappeared; that on the following Sunday (May 11) at 12:15 p. m. defendant was arrested by Detective Mellen while asleep in his bed at his lodgings, and was taken to the office of the superintendent of police, arriving there at (say) 12:30 o'clock p. m. (the earliest moment at all probable), thus paying the first of five visits paid by him to that office between that time and Tuesday, May 13, at 5:55 o'clock p. m., when he began his confession. The elapsed time, therefore, between the beginning of the first visit and the beginning of the confession was 53 hours and 25 minutes, and during that period there were five visits and four intervals between visits, the visits, according to the testimony of the superintendent, and taking his maximum and minimum figures for the visits and intervals, respectively aggregating 25 hours, and the intervals aggregating 29 hours and 45 minutes.

Defendant, however, testifies that on Sunday night (May 11) questions were "fired at" him at the station by others than the superintendent, whereby he was kept awake until 3 o'clock a. m. on Monday, instead of being allowed to sleep from 6 o'clock p. m. on Sunday until 9 a. m. on Monday, so that from that interval of 15 hours may be deducted 9 hours, leaving the aggregate time of the intervals 22 hours and 45 minutes as against 34 hours of examinations.

Again, the examinations were not begun under conditions unfavorable to defendant and were not broken by the intervals alone. Defendant was asleep in his bed at 12:15 o'clock in the day when he was arrested, and, for aught that appears, had been asleep all the night before, so that, though he testifies that he had been drinking hard for the 2 days preceding his arrest, he had had a fair opportunity to recover from the effects thereof, and, as he remained entirely on his guard on

that day and upon the days that followed, and at 5:55 o'clock p. m. on Tuesday gave a continuous, connected, detailed, and fluent account of his actions from the time that he started out, armed with a loaded pistol, with the intention of committing highway robbery, it appears that he had fully recovered at the time that the confession was made. Which view of the matter is strengthened by the facts; that his examinations were conducted in the superintendent's office (which, as we assume, was more comfortable than defendant's cell), and he was provided with food and coffee probably of a better quality than that which he would have received in his cell, with cigars and cigarettes, and with diversion in the way of visitors, since the office was at all times open to those whose business called them there, and was constantly (four, five, or six times a day) visited by each of the reporters of the daily papers published in this city, whose testimony was introduced on behalf of the state, and one of whom (being the only one who was interrogated upon the subject) added his testimony to that of other witnesses to the effect that no threats or promises were used to induce the confession in question; that defendant was neither browbeaten nor abused in any way; that he did not have the appearance of "a man who had been abused in any way, shape, or form"; and that, so far as he (witness) could see, the confession was voluntary. Being asked, "Q. Now, when he was in the office, was he apparently perfectly normal, natural, when he was with you and Mooney?" the witness replied, "Well, he was apparently under an emotional strain."

Rev. J. J. Helinski, a Catholic priest, called as a witness on behalf of defendant, had been sent for at the request of defendant, and had an interview with him shortly after the confession had been made, or rather, as may be inferred, just after his return from an automobile trip after which the confession was

made, and he gave the following testimony as to his impression of defendant's mental condition at that time:

"Q. What was the mental condition of this man at the time you saw him? A. Not that of an ordinary sane man—that is, a man in a normal condition; there seemed to be something abnormal about him. Q. Was he in such a state as would justify your taking his confession? A. I wish to state, before answering this question, to the court, that whatever answer I give to the question proposed to me concerning this matter has nothing to do with regard to the confession of Edward Doyle, because the secrets of the confession are not to be revealed to men. Q. We don't propose, Father, to delve into the confession that he made to you as a religious man; all we propose to ascertain from you, if possible, is the mental state as to know[ing] what he was doing and what he was saying? A. He wasn't in a sufficient mental state to justify my hearing his confession. Q. That was because why? A. Because all the necessary requisites for a good confession weren't there. The man was apparently like a man dazed, laboring under some heavy pressure, and that is what interfered with a good confession as a sacramental confession. Q. Now, did you note his physical condition that night? A. I have noted his physical condition first at the chief's office. Q. What was it? A. I stated to the chief of police on the first appearance of Edward Doyle that his countenance in no way would make me believe that there was any criminal intent in Edward Doyle. (Objection and ruling.) Q. Now, when was the next time you had occasion to visit Doyle, after the first time you saw him—your second visit? A. I think on the third day—the second or third day. Q. What was his mental condition then? A. Still unfit for confession. Q. When was the next time you had occasion to see him? A. Probably on the fifth or sixth day after that. Q. The first time and the second time you saw him, you refused to take his confession, due to his mental condition? A. I didn't refuse to take the confession. Q. You would not take it on account of his mental condition? A. I would not suggest to have him make a confession."

Cross-examination:

"Q. Father, without asking you what it was, to repeat anything this man here said to you, did he at any time make a confession to you? A. I would have to make a distinction in this, because I think there is a misunderstanding with regard to a sacramental confession, for the purpose of obtaining forgiveness from God, and a mere confession of facts stated. which may not be a sacramental act. Q. Well, I am asking you now as to a mere confession of facts stated. A. You mean a sacramental confession, or merely an acknowledgement of guilt? The Court: The gentleman asked whether he made a statement to you as to facts. A. What. particular facts? Q. He does not want you to disclose any secrets of the sacramental confession? A. I will answer that if Edward Doyle permits me to make that answer with regard to it. Mr. Burke: One minute, we are going to object. Mr. Luzenburg: We will withdraw the question."

Defendant in his testimony makes no other criticism of the treatment that he received after his arrest than as follows: Having taken the stand as a witness in his own behalf, his counsel propounded to him the following question, among others, to wit:

"Q. Now, it is said that you made to Superintendent Mooney a confession relative to the charge that you are now being tried for; did you make that statement to Mooney? A. Not that I know of; I may have, but I don't recollect it."

And he further testifies, in effect, that he had no recollection of anything that occurred either on Monday, May 12, or Tuesday, May 13. On his cross-examination he testifies as follows:

"Q. You can remember everything on the 11th? A. Not everything; I don't say I remember everything, because I was under fire of questions ever since I been in there up until the morning— Q. What was that you said? A. I said I was under fire of questions by a bunch of officers besides Mr. Mooney from the time that I was first taken until, I think, early in the morning, about 3 o'clock in the morning."

He nowhere suggests or hints that Superintendent Mooney or any one else importuned or endeavored to persuade or made any promise or threat, in order to induce him to make a confession, or (unless what is contained in the above-quoted answer be so considered) that he received any harsh treatment, and still less that he was in any way "brutalized"

.after his arrest, so that, so far as we are able to judge from the record, the complaint (being the only complaint made on the trial), that the confession in question was obtained "under duress and by violence" has no other support than the fact that defendant was interrogated by the superintendent of police whilst that officer held him in custody.

In connection with the appearance of defendant as a witness in the case, and with a view of discrediting his testimony, he was asked (out of the presence of the jury) whether he was the same E. C. Doyle who on October 31, 1916, in the state of Texas, pleaded guilty to a charge of burglary, and on January 5, 1917, pleaded guilty to a charge of robbery by assault, and to both questions he answered, "I was," and copies of the proceedings in the district court of Galveston county, Tex., were offered in evidence, showing that, after he had been admonished as to the consequences, he had so pleaded, and had thereupon been convicted and sentenced, upon the charge of "burglary," to imprisonment in the penitentiary for five years, and, upon the charge of "robbery with firearms," to like imprisonment, to begin upon the termination of the period of the previous sentence.

As appears also, the superintendent in his examination of defendant mentioned two other grave offenses which he was assumed to have committed, and which he was correctly informed carried the death penalty. Whether he had committed those offenses is not disclosed by this record, but he knew whether or not he had done so, as he also knew whether or not he was a paroled convict, under suspended sentences imposed upon him in Texas, and whether or not he was guilty of the murder for which he had been arrested; and, reflecting upon those matters, and upon his then predicament and prospect for the future, he may have concluded, as did Levy and Gainsburg, to "throw up his hands," in the face of adverse and hopeless conditions and prospects. His confession is rather long to be reproduced in this opinion, but, as a portion of it may have some bearing as indicating the feeling which prompted it, and will certainly illustrate defendant's capacity to recall on the evening of May 13 (after going through with the entire examination of which complaint is here made) the most minute details concerning his own thoughts and actions as connected with the killing of Levy on May 9 preceding, and to arrange and describe them in consecutive order and fluent language, the following excerpt is presented, to wit:

"I left my room about 5 o'clock in the afternoon on Friday, May 9; went to the Success Restaurant, on Canal and Rampart; walked up and down Canal street [until about 7 o'clock]; then went to Toro's bar, and a bunch of men were drinking at the bar. I stepped on up and bought a nickel beer. I am pretty sure they were shooting poker dice. I didn't have any money, but they asked me to take a drink with them and I did so. About a quarter to 9 I left there pretty well under the influence of liquor; went on out to my room, 1203 Baronne street. I stayed out there about ten minutes, thinking to myself. I was remorseful for the money I had made and squandered, which had done me no good or any one else, at the same time thinking of what my mother told me when I left home, 'If you make a dollar, son, make it honest.' Then I said, 'Well, I'll make one more job, but the money I have been making all through this time has never done me any good; I can gain nothing; I have no friends but her, so I am going to pull one more job, and then I am going back to her [a sentence omitted from the transcript, because not read]; I will further live a straight life; one more job will take me back there looking good.' So upon that I take my gun and walks down the street, right straight from my room to St. Charles avenue. There I walked up and down for about 15 or 20 minutes. I came across two gentlemen. It looked as though they had as much as $500, figuring the diamonds they wore. One had a cane in his hand. I watched them. They walked along slow, stopping several times. I am sure they were discussing business. They went down from St. Charles to Calliope street, and I followed them, and I stood cater-corner from them, watching them. When they got started off down Calliope, I said, 'Here's my chance,'

never suspecting that they would refuse to hold up their hands. Under the influence of liquor, I did not consider the time or how many people were walking around and awake, and approached them with the gun in my hand, a 38-caliber, which was formerly nickel-plated, but rusty. I approached them from behind and told them to throw up their hands. One threw up his hands and then came down with them, at the same time telling the other man, 'Kill him! kill him!' With that it looked as though the other man was going to his pocket, but at the same time the other man raised his cane and stepped towards me, and, being scared at the time, realizing that there were people coming behind me, the gun went off. I stood for about five seconds and didn't know what to do; then finally I thought it would be best to run, so I then threw my right hand in my pocket with my gun, ran on down Carondelet street, out Calliope and down Carondelet, and, as I was running some one tried to stop me. I drew my hand from my pocket, and as I did I jarred a hole, with my gun, in my pocket, causing a hole to be driven, and the quarters I had in my pocket fell out. Then I kept on running," etc.

And he goes on to say that he walked about aimlessly for a while, then went to his lodgings, slipped in and got his hat (having previously worn a cap), went back to Toro's bar, felt dazed, walked again, then back to the bar; mentions some one who was talking and to whom he listened, and various other circumstances; was invited to drink, and did so; had 65 cents in his pocket, and went to a restaurant and bought a ham sandwich and cup of coffee; borrowed $5; went to another place and got into a game of poker, in which he won $29. He concluded the statement as follows:

"The next morning I went out on the tracks of the Terminal Station; I went way out and threw the cap and gun beneath a bunch of rubbish. That was on the night of the shooting"

—following which were a few questions which, by consent, were omitted from the transcript.

Morris Bendahan, called by the state, testified that he was going up Carondelet street about the time of the shooting, and a man came running towards him whom he tried to trip up; that the man tried to draw a weapon from his right-hand pants pocket, and in doing so dropped some money out of his pocket, by Tranchina's restaurant (which is on the corner of Howard avenue and Carondelet street).

Tranchini testified that he is the proprietor of the restaurant, that he heard and saw some men running on the occasion in question, and heard some money drop on the pavement; that he came out and picked up three quarters, which, having marked, he gave to the "inspector", and two of the quarters, which he identified by the marks, were offered in evidence, but he was unable to find the mark on the third quarter.

A barkeeper employed at Toro's testified that defendant was known to him as "Whip"; that on the night of the shooting he came to the place between 11 and 12 o'clock and wanted to hand witness a pistol; that witness told him that he had no time to fool with him; and that he went to the rear, and on his return said to witness: "Listen; I put that pistol in the back, and if you open your mouth, I'll kill you. Back in the toilet," he said. He further testified that a pistol that was shown to him on the trial looked like the one that defendant had exhibited; and on cross-examination he testified that defendant told him that he had shot at some one, but did not tell him that he had shot Levy.

George Long, chief of detectives, being shown a pistol, testified that it was 38 caliber; that it was found by Jesse Robinson, a barkeeper at Toro's, in his presence, just on the outside of the toilet, on the evening of May 13, 1919, about 7:30 o'clock. Being asked if he knew where defendant was at that time, he replied: "I left him in the office—superintendent's office."

## Opinion.

The publicists, lay and professional, seem to agree that more criminals, in proportion

to the number prosecuted, escape conviction and punishment in the United States than in any other civilized country on earth, and that the courts are largely to blame for that condition. It appears to us, therefore, that, when learned and competent scholars have for years specialized in the study of particular principles and rules affecting the administration of criminal justice, and have published to the world the genesis and exegesis thereof, in exhaustive and monumental treatises, replete with citations of vast numbers of decided cases examined by them, it is the part of wisdom and the duty of a judge participating in such administration and unable to make the research upon his own account to avail himself of the information and the deductions therefrom thus placed at his command. We have therefore, made very liberal drafts upon the sources thus mentioned for the purposes of this case.

It has been said that there is no better evidence of guilt than a "well-proved" confession. The difficulties have arisen in ascertaining the tests to be applied in determining when a confession is well proved, and because the courts have frequently lost sight of the fact that the underlying and fundamental principle upon which alone a confession should be excluded is that which concerns its value as evidence.

"The principle, then," says Prof. Wigmore, "upon which a confession may be excluded is that it is, under certain conditions, testimonially untrustworthy. What circumstances may make it so and what degree of untrustworthiness is sufficient are further questions; but the essential feature is that the principle of exclusion is a testimonial one. * * * This theory, while developing different and inconsistent tests at the hands of various courts, seems to have been generally accepted as the underlying and fundamental principle since the first introduction of any doctrine about the inadmissibility of confessions." Wigmore on Ev. vol. 1, p. 932, § 822.

"This principle of testimonial untrustworthiness," the author continues, "being the foundation of exclusion, it follows that the exclusion is not rightly rested on certain other possible and occasionally plausible theories: (a) A confession is not excluded because of any breach of confidence or of good faith which may thereby be involved. This has been accepted from the beginning. * * * (b) A confession is not excluded because of any illegality in the method of obtaining it or in the speaker's situation at the time of making it. The general principle that the illegality of the source of evidence is no bar to its reception is well established. * * * (c) Finally, a confession is not rejected because of any connection with the privilege against self-crimination." Id. p. 934, § 823.

"Modern usage," says the same author, "generalizes by employing the term 'inducement' [instead of the terms "a promise of benefit or a threat of harm," and "voluntary"] to cover all modes of influence," and the "test which must be taken as on principle the orthodox one," and the one which, "in one phrasing or another, has from time to time received the support of eminent judges so frequently that it may fairly be put forward as having claims as satisfactory on precedent as on principle," is: "Was the inducement such as that there was any fair risk of a false confession?" Id. § 824.

And the following with other English and American cases are cited (in the note) as sustaining the statement so made, to wit:

"1836, Littledate, J., in R. v. Court, 7 C. & P. 486: 'The object of the rule relating to the exclusion of confessions is to exclude all confessions which may have been procured by the prisoner being led to suppose that it will be better for him to admit himself to be guilty of an offense which he really never committed.'

"1836, Coleridge, J., in R. v. Thomas, 7 C. & P. 346: 'The only proper question is whether the inducement held out to the prisoner was calculated to make his confession an untrue one.'
*      *      *      *      *      *

"1848, Erle, J., in R. v. Garner, 1 Den. Cr. C. 331: 'I think in every case it is for the judge to decide whether the words were used in such a manner and under such circumstances as to induce the prisoner to make a confession of guilt whether such confession were true or no.'
*      *      *      *      *      *

"1857, Lewis, C. J., in Fife v. Com., 29 Pa. 437 [quoting from a case decided by McKean, C. J., in 1792 (Com. v. Dillon, 4 Dall. 117, 1 L. Ed. 765)]: ' "The true point for consideration is whether the prisoner has falsely declared himself guilty of a capital crime." * * * In deciding this point, the chief question is whether

the inducement held out was calculated to make the confession an untrue one.'

"1881, Hammond, J., in U. S. v. Stone [C. C.] 8 Fed. 232, 241, 256: 'The real question is whether there has been any threat or promise of such a nature that the prisoner would be likely to tell an untruth from fear of the threat or hope of profit from the promise.'

"1893, Haralson, J., in Beckham v. State, 100 Ala. 15, 17, 14 South. 859: 'The controlling inquiry is whether there had been any threat of such a nature as that from fear of it the prisoner was likely to have told an untruth. If so, the confession should not be admitted. Its exclusion rests on its connection with the inducement; they stand to each other in the relation of cause and effect. If it is apparent that no such connection exists, there is no reason for the exclusion of the evidence.' "

In the same volume will be found the following:

"§ 833. A threat of corporal violence is the clearest case of an inducement that may vitiate a confession. * * * Confessions in fear of a mob are usually made under circumstances calculated to induce a false confession. * * * The sweat box of the police, so far as it may signify direct intimidation, by starvation or otherwise, would invalidate a confession; but the term is often exaggeratedly applied to any form of solitary confinement, and does not then signify such intimidation as would exclude a confession."

"§ 851. In this country the orthodox English and Irish doctrine declining to consider the mere fact of arrest as sufficient to exclude a confession has been universally accepted."

"§ 865. *Explanation of Sentimental Excuses in the Law of Confessions*—that absurdities have disfigured the law of the admissibility of confessions, that the excessive caution in listening to them has given an appearance of sentimental irrationality to the law and has obstructed the administration of justice, cannot be denied, and has often been conceded by judges. 'I confess,' said Baron Parke, 'that I cannot look at the decisions without some shame when I consider what objections have prevailed to prevent the reception of confessions in evidence; and I agree with the observation of Mr. Pitt Taylor that the rule has been extended quite too far, and that justice and common sense have been too frequently sacrificed at the shrine of mercy;' and Mr. J. Erle added: 'I am much inclined to agree with Mr. Pitt Taylor, and, according to my judgment, in many cases where confessions have been excluded justice and common sense have been sacrificed, not at the shrine of mercy, but at the shrine of guilt.' "

And the explanation of the condition thus deprecated goes back into the earlier history of England, to the relations of the different classes of society and the disadvantages under which many of those who were charged with crime labored in making proper defenses, and, among others, that they were allowed neither to testify in their own behalf nor to have counsel to represent them. But the author continues:

"§ 865. [Page 998.] There is for us no such explanation and no such excuse. * * * The orthodox principle that a confession may be excluded when the inducement was such as probably to produce an untrue confession is amply fair and cautious, and should be applied in its original and pure form. * * * [Page 1002.] The policy of the future then should be to receive all well-proved confessions in evidence, and to leave them to the jury, subject to all discrediting circumstances, to receive such weight as may seem proper."

"§ 867. In conclusion, two considerations not often kept in mind must be emphasized. In the first place, the only real danger and weakness in a confession—the danger of a false statement induced by an important advantage—is of a slender character, and the cases of that sort are of rarest occurrence. No trustworthy figures of authenticated instances exist; but they are concededly few. * * * The policy of the future, then, should be to receive all well-proved confessions in evidence, and leave them to the jury, subject to all discriminating circumstances, to receive their proper weight."

From an exhaustive publication by the well-known and highly esteemed American Editor of the works of Best and Taylor on Evidence the following excerpts are taken: Chamberlain's Mod. Law of Ev. vol. 2:

"§ 1524. (a) *Misleading Inducements—Who are Persons in Authority—A Question of Public Policy.*—It would seem that the English rule that the arresting officer should not lay a trap in this connection for the prisoner and the general rule that the persistent interrogation of prisoners by officers is to be discouraged are of doubtful public utility. Such questionings are not often, it is true, conducted with entire fairness to the prisoner. Still it is probable that

substantial injury is seldom done in that way to the cause of an innocent person. The truth or falsity of statements thus secured is entirely determined by the actual reality of things, and it will happen but in few instances that the bare statement of the accused can be decisive against him. The modern preparation for trial, with information pouring in from all sides, through a practically ubiquitous press and many other means of rapid communication, presents a very different situation regarding any incriminating statement which an accused may make from that existing in rural England when the rule in question arose. In these days a prisoner's trial was a hasty performance, and judge and jury, sitting at any assize town, could scarcely know what was taking place in the next parish. In the rare instances, when an innocent man is so overwrought as to make a false statement against himself, the error is almost certain, under the conditions of a modern criminal trial, to be rectified upon investigation. Should it happen, however, that a guilty person has been led to point out the existence of facts which, when compared with reality, are discovered to be actually true, there would seem but little cause for regret. So far as any self-incrimination fails, when tested by the actuality of the facts to which it refers, to be corroborated by them, it is but little to be apprehended that a jury will give it undue weight against the prisoner. It is far more probable that, should judicial interrogation be explicitly or implicitly forbidden, valuable clues, easily followed only when the matter is fresh, will be lost both to society and to one unjustly accused. Public justice may thus be prevented from learning the original mistake and punishing the real offender, while the person under arrest is, at the same time, deprived of all opportunity of proving his innocence and reduced to a bare unconvincing assertion of it, which the law itself has made it impossible for him to verify."

Page 1937, note:

"Where nothing appears but the fact of questioning one accused of crime at an unusual hour, no ground is furnished for rejecting a confession. The prisoner was taken and carried to New Bedford by two police officers, on suspicion that he was guilty of the murder of Howard, that they stripped him of his clothing, and searched him, and placed him in a cell at the station house, and that about 10 o'clock at night they took him out of his cell for the purpose of questioning him and examining him and examined him from that time until midnight, without warning him of his right not to answer unless he chose to do so, or offering him an opportunity to consult with counsel or friends.

The defendant's counsel objected to the admission in evidence of statements then made by the prisoner to the police officers tending to show his guilt. But it was ruled that, in the absence of any evidence of threats or promises other than might be inferred from the above, such statements were admissible in evidence.' Com. v. Cuffee, 108 Mass. 285 (1871)."

Page 1938, note containing expression of view by Mr. Denman, afterwards Lord Chief Justice (from Edinburgh Review):

"Those English justices of the peace, who seem alarmed at the least chance of hearing the truth from a culprit, and so earnestly entreat him to disclose nothing that can ever tend to bring harm to him, are rather to be admired for romantic generosity than for wisdom or any beneficial advantage resulting from that conduct to the public. Innocence may be deprived of great advantage if deferred from promptly telling its own unvarnished tale. To keep back full information is, in some events, nearly equivalent to confessing guilt, and the warning which prevents the story from being related at the earliest possible moment may prevent it from producing at any time its just effect."

"§ 1530. The mere fact that the incriminating statement is made while the declarant is under arrest, or is in the hands of the sheriff, or police officer, is not, of necessity, sufficient to exclude his statement. Even should the restraint imposed upon the declarant go so far that he is not only actually in prison, but is also tied hand and foot, handcuffed, chained, placed in the stocks, or otherwise subjected to physical discomfort, no necessary rejection of the declaration is involved. That the prisoner is laboring at the time under strong excitement is of little moment. Nor is it of consequence that, in conversation with the accused, his guilt is assumed by all persons present. The confession may still be voluntary where the mind or will of the accused is not forced, as in duress, to the making of any particular statement, or where, although apparently induced by one of the parties who conducted the prisoner to gaol, the act was calculated to excite, not a fear of temporal punishment, but horror at the recollection of the crime."

"§ 1571. In the absence of statutory regulation to the contrary, a confession may be made orally. Oral confessions may be in any form. A favorite one is that of questions and answers. Quite frequently this form of statement is prepared by the officer of the law who has the accused in custody. That the questions are leading or objectionable as assuming the guilt of

the accused is by no means fatal to the admissibility of the statement. The confession, in other words, is not regarded as involuntary, under the rule of procedure merely because it is not spontaneous."

The following is taken from Wharton's Crim. Ev. (10th Ed. 1912) vol. 2, p. 144, to wit:

"First, a confession is not admissible in evidence where it is obtained by a direct temporal inducement arising out of threat or fear or hope or promise.

"Second, a confession is not admissible in evidence where it is made subsequent to an inadmissible confession, unless it is shown that the influence that caused the first confession has ceased to operate in any way on the accused.

"A confession is admissible when made without inducement. Such a confession is not affected; By the mere fact that it was made when the accused was under arrest; nor (b) where it was elicited by questions assuming guilt; nor (c) by promise of collateral benefit; nor (d) procured by trick or artifice; nor (e) when made to a person in authority.

"The factors to be considered by the court in determining whether or not the confession offered was elicited by improper inducement are the age, situation, and character of the accused, his mental condition as to control of his faculties, the causal connection between the inducement and the confession, the nature of the inducement, and such surrounding circumstances as are shown in the concrete case on trial."

[1, 2] It will be noted that the defendant states in his confession that in attempting to draw his pistol while running down Carondelet street he "jarred" a hole in his pocket, and "the quarters" he had there "fell out," which statement was corroborated by two witnesses; one of whom having picked up the quarters, they were produced in court. It will also be noted that defendant stated that he used a 38-caliber "gun," and that after the shooting he went to Toro's, and that he makes a confused statement as to the disposition of the "gun"; the evident reason being that he wished to avoid implicating the barkeeper, who, being called by the state, testified that defendant had appeared at Toro's, requested him to take charge of the gun, and, upon his declining to do so, told him that he had shot at a man, and would kill him if he opened his mouth.

All the circumstances considered, it is impossible to doubt the verity of the confession upon the main point—i. e., that defendant committed the crime of which he has been convicted—and equally impossible to doubt that he was in full possession of his memory when he made the confession. That it should have so failed him on the trial that he was unable to remember that he had made it, or to remember anything else on two particular days of his life, is supported by nothing but his own statement. He does not pretend to have suffered in that way before or since, and no witness was called to testify to any pathological condition which would account for it when the statement was made. Even, however, were the statement accepted as true, it is wholly immaterial to the case; the important question being, not whether his memory was in good condition in August, when he gave his testimony, but whether he was suffering from amnesia on May 13, when he made the confession, and it is not pretended that he was, nor, is it shown that his condition at that time, physical or mental, was otherwise such as to have prevented his making a truthful confession. Mr. Moody testifies that he appeared to be laboring under an "emotional strain," and Mr. Helinski (the priest) testifies that, when he saw him, an hour or two after the confession, his mental condition was "not that of an ordinary sane man—that is, a man in a normal condition; there seemed to be something abnormal about him"; that he (witness) had "stated to the chief of police, on the first appearance of Edward Doyle, that his countenance in no way would make me [witness] believe that there was any criminal intent in Edward Doyle." But the normal man in civilized life would probably exhibit some emotion in confessing a murder, and thereby subjecting himself to the penalty of death; and, if the normal man's mental state is affected, as it surely is, by the condition in which he finds himself,

then the abnormal becomes the normal. Thus it would be natural, and therefore normal, for an ordinary man to be in a different state of mind during a battle, or in an open boat in a storm, from that which he would enjoy in the quiet of his home; and so it would be natural and normal that defendant, in view of the situation in which he found himself, should appear abnormal to his interviewer, whose situation was so utterly different that he was unable, from his countenance, to believe that defendant, who, as a matter of fact, was under different sentences for burglary and robbery armed with a deadly weapon, and who had just confessed that he had killed a man in an attempt to rob him, could have any criminal intent.

It has been repeatedly held by this court that a confession is none the less admissible in evidence because made to a person in authority, such as a sheriff, police officer, or judge, and while the person making it was in custody, or actually in prison. State v. Hash, 12 La. Ann. 895; State v. Simon, 15 La. Ann. 568; State v. Maimée Alphonse, 34 La. Ann. 9; State v. Jones et al., 47 La. Ann. 1530, 1531, 18 South. 515; State v. Berry, 50 La. Ann. 1314;[1] State v. Lewis, 112 La. 872, 36 South. 788; State v. Aspara, 113 La. 955, 37 South. 883; State v. Pamelia, 122 La. 214, 47 South. 508; State v. Besancon, 128 La. 85, 54 South. 480.

The authorities, as we have seen, are agreed that the confession, to be voluntary, need not be spontaneous, and that has been so decided in State v. Besancon (supra), where the confession was obtained by means of questions propounded to the defendant by the district attorney, and, with the answers thereof, transcribed and read to the accused, of which it was said by this court, "No fairer mode of perpetuating oral statements has ever been devised." It is evident, therefore, that "custody" and interrogation do not necessarily imply the "constraint, pressure, or compulsion" constituting the duress which would invalidate a confession, and we do not find that the interrogation was carried to that extent in this case, nor do we find that any violence was used.

In State v. Bartley, 34 La. Ann. 147, it was said:

"Whether the confession was voluntary or not, and admissible or inadmissible, under the evidence submitted, is a mixed question of law and fact which we are authorized to review; the evidence on the point being set forth in the bill of exceptions. Though this is the case, the ruling of a judge of the first instance on a question of this character should not be disturbed, unless clearly erroneous. The presence of the witnesses before him, their manner of testifying, character, etc., offered an opportunity of reaching a correct conclusion on the point at issue superior to any we possess. Our examination of the record, although the evidence is conflicting, satisfies us that his ruling in this instance was correct."

That language was quoted and applied in State v. Porteau et al., 52 La. Ann. 477, 26 South. 993, and again (save the last sentence) in State v. Edwards et al., 106 La. 678, 31 South. 308, and, in our opinion, should be applied here, save so much as refers to conflicting evidence, of which there appears to be none in the record before me worthy of serious mention.

There being no other points which are seriously insisted upon, or which, upon examination, are found to be possessed of any merit, the conviction and sentence appealed from are affirmed.

O'NIELL, J., dissents from the ruling on the admissibility of the alleged confessions, taken down in shorthand notes by a stenographer, and will hand down a written opinion. See 84 South. 322.

DAWKINS, J., dissents.

### On Rehearing.

PROVOSTY, J. The reason for granting a rehearing in this case was to afford op-

---

[1] 24 South. 329.

portunity for further argument on the question of the admissibility in evidence of the confession of the accused; the contention being that the confession was in a sense forced from the accused by the duress of the protracted course of questioning to which he was subjected by the superintendent of police.

[3] The provision in our Constitution that "no person shall be compelled to give evidence against himself in a criminal case, or in any proceeding that may subject him to criminal prosecution" was not intended to bring any change in the law of evidence on the subject of admissibility of confessions. Now, as before, the admissibility of a confession depends upon whether it was voluntary; and the question of under what circumstances a confession is to be regarded as having been voluntary is precisely the same now as it has ever been. To contend the contrary is simply to lose sight of what is contained in all the law books upon the subject of evidence in criminal cases.

[4] In those books, and in our own jurisprudence, the point is firmly settled that the fact that the confession was made while under arrest and in answer to questions propounded by a police officer does not render it inadmissible, so long as it was voluntary, as voluntariness is understood in the law of evidence. 16 Corpus Juris, 719; 1 R. C. L. 566; 18 L. R. A. (N. S.) 801; Underhill, Crim. Ev. 174; State v. Mulholland, 16 La. Ann. 376; State v. Hogan, 117 La. 866, 42 South. 352; State v. Berry, 50 La. Ann. 1309, 24 South. 329; State v. Howard, 127 La. 435, 53 South. 677; State v. Rugero, 117 La. 1040, 42 South. 495. In State v. Canton, 131 La. 255, 59 South. 202, and State v. Besancon, 128 La. 85, 54 South. 480, the interrogation was by the district attorney, an officer of much greater authority than a policeman or chief of police. In fact, the very case so largely relied upon by the defense, Bram

v. U. S., 168 U. S. 532, 18 Sup. Ct. 183, 42 L. Ed. 568, has as one of its syllabi the following:

"The mere fact that a confession is made to a police officer while the accused is under arrest, in or out of prison, or is drawn out by his questions, does not necessarily render the confession involuntary."

[5] Another point that may be considered to be settled is stated in 16 C. J. 723, as follows:

"*Caution or Warning—Necessity for.*—In the absence of a statute requiring caution or warning the fact that a voluntary confession was made without accused having been cautioned or warned that it might be used against him does not affect its admissibility."

In support of this text decisions are cited from Alabama, Arkansas, Colorado, Louisiana, Mississippi, Nevada, New York, Oklahoma, Pennsylvania, Porto Rico, South Carolina, England, and none contra. For cases from other states, see 18 L. R. A. (N. S.) 791. See, also, 50 L. R. A. (N. S.) 1083.

[6] Therefore in the present case, as in every other in which a confession is sought to be offered in evidence, the sole question is simply whether the confession has been free and voluntary; and in every case that question has to be determined exclusively by taking into consideration the circumstances attending the making of the confession.

In that connection it may be well to mention that the Bram Case, supra, upon which so much reliance is placed by the defense, has been considered both by text-writers and courts to be highly exceptional—in fact, an unsafe guide. McKelvey on Ev. § 841; Beale's Crim. Plead. & Prac. § 283, note; Thayer, Cases on Ev. p. 294, note; Greenleaf on Ev. (16th Ed.) note by Prof. Wigmore.

In the present case to have warned the accused that whatever inculpatory statements he might make would be used as evidence against him would have been like car-

rying coals to New Castle; for he may be said, from the record, to have been a professional criminal, and one, at that, not inexperienced in the criminal courts. The very persistence with which he avoided incriminating himself in the course of the prolonged examination shows that he stood in no need of such warning.

There was entire absence of harshness towards him or ill treatment of any kind. He was not sought to be intimidated by seclusion and isolation. The door was at all times open while the examination was going on, so that newspaper reporters, and all others who chose, might be present; and the questioning was by the superintendent of police alone, save perhaps for a question or two that may have been injected by some bystander. His testimony on the witness stand to the effect that he did not remember having made a confession, from which he would have had the jury deduce that he had been so exhausted at the time of making the confession that what he had at that time done or said had left no impression on his mind, is at variance with the evidence patent on the fact of the confession not having been the work of a clouded or enfeebled intellect. The confession is a consecutive, detailed narrative which could have emanated only from a mind having a firm grasp of the subject it was dealing with. . And we know that it was accurate; and the newspaper reporter who was present and the stenographer say that it was dictated continuously, and, the stenographer says, "fluently." No doubt, accused was under a great mental strain; but, as the superintendent of police well observes, this was but natural after his having already confessed to two capital offenses. Father Helinski would have carried more weight as a witness had he not also seen innocence written large in the countenance of accused, a confirmed and hardened burglar and a murderer, and had he not continued to discern in accused

for two or three days the same enervation as on the night of the confession. The superintendent of police and the stenographer say that the accused was in good physical and mental condition.

There was a reason for protracting the examination and for repeatedly bringing the accused to the office of the superintendent of police. New Orleans was just at that time being afflicted with a series of burglaries, disturbing every home with a sense of uneasiness, if not alarm, and accused was suspected to have been connected with these burglaries; so that the examination was not with reference alone to the murder to which he eventually confessed, but also with reference to all these burglaries; and his being brought to the office of the superintendent of police from time to time was for the purpose of identification with the perpetrator of these burglaries. And the event proved the wisdom of that course, since accused was identified with two of the burglaries so fully as to have been left no choice but to confess to them.

[7] All that the law of evidence requires in a case like the present is that the confession should not have been the result of compulsion, whether physical or moral; and that the confession was not such in this case the learned trial judge, than whom no more experienced magistrate in criminal cases sits in this state, or perhaps in the entire country, was satisfied, and we also, after most mature consideration, are satisfied.

In its facts this is not a case for the manifestation of that tenderness to criminals (now so extensively imputed to the courts as a reproach) by which the courts are sometimes inveigled into bringing into use for mollifying, while not exactly modifying, the law, those resources of ratiocination which Justice Brewer in his dissenting opinion in the Bram Case, supra, calls the "refinement of analysis."

The judgment heretofore handed down

herein is therefore reinstated and made final.

O'NIELL, J., dissents, adhering to the opinion which he has heretofore handed down.

DAWKINS, J., dissents.