(53 South. 353.)

No. 18,301.

STATE v. McKOWEN.

(June 20, 1910. Rehearing Denied Oct. 17, 1910.)

*(Syllabus by the Court.)*

1. CRIMINAL LAW (§ 141*)—CHANGE OF VENUE—FORWARDING COPY OF DOCUMENTS.

When, under a change of venue, a case has been transferred from one court to another, the failure of the court where the indictment was found to forward a copy of all the documents to this court will not vitiate all the proceedings, particularly where the failure has been cured under a writ of certiorari.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 260–263; Dec. Dig. § 141.*]

2. INDICTMENT AND INFORMATION (§ 25*)—PRESUMPTIONS OF REGULARITY — GRAND JURY.

There is a presumption that before the change of venue was granted all the proceedings in a criminal case have been carried on regularly, and, where the indictment states that the grand jury had been impaneled, sworn, and organized, that the statement is a sufficient legal basis for the trial of the accused. This presumption of regularity also extends to the fact that the foreman of the grand jury had been selected and sworn.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 92, 108–114; Dec. Dig. § 25.*]

3. CRIMINAL LAW (§ 1031*)—APPEAL—OBJECTIONS NOT RAISED BELOW.

As there is a presumption of regularity as to the proceedings, the defendant cannot on appeal object to the proceedings as irregular, as such objection should have been raised at the trial.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2619, 2625; Dec. Dig. § 1031.*]

4. CRIMINAL LAW (§§ 371, 783*)—EVIDENCE OF MOTIVE.

In a case of homicide, where the evidence is circumstantial, the state may introduce in evidence a copy of an indictment found against the accused, charging him with another crime, for the purpose of proving the "motive." The instruction of the judge to the jury that the indictment is merely a link in the chain of evidence, to be considered as such, and that the fact that the accused is charged with another crime is not proof of his guilt of the homicide, is a sufficient protection of the rights of the accused.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 830–832; Dec. Dig. §§ 371, 783.*]

5. CRIMINAL LAW (§ 783½*)—TRIAL—RECEPTION OF EVIDENCE.

Where the state seeks to introduce evidence deemed to be relevant and a link in the chain of circumstances, its relevancy can be determined only by the trial judge after he has heard it, and if he deems it not relevant he must instruct the jury to disregard it.

[Ed. Note.—For other cases, see Criminal Law, Dec. Dig. § 783½.*]

6. WITNESSES (§ 300*)—PRIVILEGE OF ACCUSED—REFUSAL TO ANSWER QUESTION.

While the accused, as a witness, may decline to answer any question that incriminates him, he may be made to decline before the jury.

[Ed. Note.—For other cases, see Witnesses, Dec. Dig. § 300.*]

7. WITNESSES (§ 352*)—IMPEACHMENT.

The accused as a witness may be impeached, and an experiment may be used for that purpose, if properly conducted.

[Ed. Note.—For other cases, see Witnesses, Dec. Dig. § 352.*]

Appeal from Twenty-Second Judicial District Court, Parish of East Baton Rouge; H. F. Brunot, Judge.

E. C. McKowen was found guilty of murder, and appeals. Affirmed.

S. McC. Lawrason and Laycock & Beale, for appellant. Walter Guion, Atty. Gen., Jos. L. Golson and Hubert N. Wax, Dist. Attys., Isaac D. Wall, and Kilbourne & Walker (R. G. Pleasant, of counsel), for the State.

BREAUX, C. J. The defendant, Emmett C. McKowen, was indicted by the grand jury

East Feliciana on the 8th day of March, [...]0, for the alleged murder of Edward K. J[...]on, in that parish, on the 17th day of October, 1909.

He was arraigned.

He filed a motion for a change of venue, alleging the prejudice existing against him in the public mind.

In his affidavit for a change of venue, he averred that an indictment (the indictment charging him with murder) was pending against him in the district court for East Feliciana for the crime alleged.

The motion was sustained, and the case was transferred to the parish of East Baton Rouge.

The sheriff of the parish of East Feliciana was ordered to transfer the defendant to the sheriff of the parish of East Baton Rouge.

The judge of the district court of East Baton Rouge ordered the clerk of court to make entry in his minutes of the extract of the minutes of the Twenty-Fourth judicial district court for the parish of East Feliciana.

Defendant was put on his trial in East Baton Rouge on the 20th day of April, 1910.

On the 30th of the same month, he was found guilty as charged without capital punishment.

He appealed.

On the 11th day of this month, the day the case was heard in this court, defendant filed an assignment of errors averring eight different grounds of nullity of the verdict and sentence.

A few days prior to that time, the prosecuting officers applied to this court for a writ of certiorari to complete the record, which was granted.

In his return to this writ, the clerk of court for the parish of East Baton Rouge certified that the document called for to complete the transcript of appeal was not included in the transcript for reason which he states, i. e., "delay in forwarding it to him," but that immediately after its receipt he "had" forwarded it to the clerk of this court, who acknowledged receipt.

The gravamen of defendant's complaint is that the transcript did not show the opening of the court in which the indictment was found; it did not show that a grand jury was impaneled and a foreman appointed and sworn.

We will take occasion to state:

In transferring a case from one court to another, the clerk ought to make a list of documents, relating to the cause.

But failure to forward a copy of all documents will not be so fatal as to vitiate all the proceedings, particularly when the failure is cured under a writ of certiorari.

There may be irregularities in the transfer of the cause which may be cured; but, if not cured, nullity of verdict and sentence will not necessarily follow.

The defendant in a case reported in 28 La. Ann. 35 (State v. Harper) contended that the transfer of the case had not been regular, and that the court never acquired jurisdiction of the cause.

The court said, quoting from the syllabus:

"It is sufficient to know that the case was in the court and the only court having jurisdiction over the defendant."

There is no necessity of going that far in the present case, for there were copies forwarded in the first instance, and afterward, as before stated, in answer to a certiorari, the slight oversights were corrected.

It must not be overlooked, in considering the questions at issue, that the change of venue was granted and the transfer made at the instance of the defendant.

The decision in State v. Stuart, 35 La. Ann. 1017, is closely analogous to the present, and to it, for that reason, we refer with more confidence than we had in considering the Harper Case, cited above, although in some respects the Harper Case has some pertinence.

The record showed in the Stuart Case that the grand jury had been sworn, for the indictment contained that distinct statement.

The indictment in the present case contains a similar statement.

It is therefore equally evident in the present case that the grand jury had been sworn.

Under the decision cited supra, the indictment which states that the grand jury had been impaneled and sworn and otherwise organized is sufficiently legal.

There is a presumption that the grand jury was regularly organized.

The indictment, said the court in the case cited infra, was presented to the court without the least objection. Trial had, and verdict rendered. State v. Tazwell, 30 La. Ann. 885.

The court sustained a similar presumption in State v. Watson, 31 La. Ann. 379.

We will not discuss this particular branch of the case further.

Although the presumption of regularity above referred to applies to every irregularity urged by the defense, we take up and consider the further objection of the defense that it does not appear that the foreman of the grand jury had been selected and sworn.

It is shown that the change of venue had been ordered, and, in addition to the copies originally showing that fact, it was shown by copies forwarded to complete the record.

Above all, there is a presumption of regularity as relates to these papers, which the defendant could not question at this time, not having raised the least objection at any time during the trial. It was raised, as before stated, on appeal on the day that the cause was called for argument.

In State v. De Pass, 45 La. Ann. 1154, 14 South. 77, cited by defendant, the record was woefully incomplete.

The court said that it was throughout so flagrantly defective "as to make it difficult to be dealt with as a judicial record at all,"

and that upon such a "record a judgment could not stand."

There is no similar irregularity in the case before us for decision.

In answer to the complaint that it is not shown by the minutes that the court was opened and that the proceedings were had in open court in East Feliciana parish prior to the transfer, we can only say that the court was opened by the presiding judge, and all important steps which were taken in the prosecution were in open court. We quote from the minutes:

"March 8, 1910. The grand jury came into court, the members all being present, and made presentment as follows: State v. Emmett C. McKowen. Charge—murder. A true bill. J. D. Norwood, foreman."

On the next day the minutes show that he pleaded.

When he was called upon to plead in the district court of East Baton Rouge, on motion of the defense, the court did not have a plea entered for the reason, as counsel for defendant stated, that he had been arraigned in the district court in East Feliciana.

The judge of the district court signed the judgment changing the venue in open court on the 19th day of March, 1910.

The trial:

The state offered an indictment against the defendant found in the federal court in December, 1908, charging him with sending anonymous letters of a foul and scurrilous nature through the mail, to lay a foundation to prove motive.

This testimony was earnestly opposed by learned counsel through argument pressed upon our attention.

But of this, later.

At another time in the course of the trial, the state, through counsel, questioned Edward McDermott, her witness, about E. K. Judson and others, regarded as "expert letter" writers. Two other witnesses were examined on the same subject.

This inquiry led to discussion and has given rise to points before us for decision.

Some of the testimony of these witnesses was taken and forms part of the transcript as the one part of bill of exception.

At another point in the case, the defendant, while he was on the stand as his own witness, was asked, on cross-examination, by counsel for the state, if Judson was sufficiently intimate with him to have anything in writing by the decedent. To which inquiry he replied in the negative and said that he had never written to him.

The purpose, the state said, was to show intimacy "between the doctor and Judson."

Witness was then asked how he spelled the word "incorrigible." The question was objected to by the defense. The court ruled that the question was proper. The defendant then claimed the privilege of those who do not choose to testify to particular facts that might be incriminating.

On that ground he was excused from answering.

At another time, demonstration was made before the jury mainly to contradict the defendant as a witness. The following is a narrative of the facts:

The jumper used for the demonstration was the defendant's. It had a storm apron on the night of the alleged murder and at the time of the demonstration.

It is stated substantially that defendant drove the jumper the night of the alleged homicide to the post office of Wakefield to within a few feet of the spot where Judson's body was found the morning after the alleged homicide.

Persons who saw the defendant driving in the jumper on the night in question stated: That the defendant was seated in the buggy with the storm apron or lap robe across his knees. It was attached to the dashboard. That it was a dry night, and that the tracks of a jumper led from the briar patch where the state contends the body of Judson had been temporarily placed. That on cross-examination defendant admitted that he drove in his jumper to Wakefield on that night, but denied that he carried the body of Judson, and denied that the bottom of the buggy or the space under the lap robe or storm robe was large enough to contain a small body between a man's legs so that it could not be seen. It appears that Judson's weight was between 90 and 100 pounds and his height 5 feet 1 inch.

Frank Allen, for the purpose of the demonstration, was placed in the jumper on his back with his legs flexed, which was in accordance with the description given by several witnesses of the position of Judson's body when found in rigor mortis on the side of the road.

The foregoing is a narrative of the salient facts brought up as forming part of the questions of law to be reviewed:

In passing upon the points of law, we will refer to these and other facts in the record.

Defendant's objection to the indictment as evidence:

The indictment, and the letter, to which we will have occasion to refer later, are not before us, though they were admitted in evidence.

The case rested upon circumstantial evidence.

Generally, evidence of another crime is not admissible.

There are exceptions; it is sometimes pertinent to prove the motive which prompted the defendant.

If there was an intention on the part of the defendant to keep a secret, or to prevent a secret from being divulged, and it was thought for that reason that there was a motive, the evidence, i. e., the indictment, for another crime, is admissible.

The fact that it may be that the jury inferred that the defendant was entitled to little consideration if he had belittled himself so low as to send anonymous letters

would not of itself be sufficient to exclude the testimony if it was otherwise admissible.

Nothing further than the one fact—the indictment—was admitted.

Apprehension of the influence such testimony might have affords no good ground to exclude the indictment if it be connected with the chain of circumstantial evidence in the case.

We are not in possession of all the facts, not even of the full text of the indictment.

The trial judge knew all the facts, as we deem.

Something must be left to his discretion.

The trial court instructed the jury "not to consider the indictment as evidence of the guilt or innocence of the charge therein laid against the defendant, but only as a circumstance to be weighed by it in connection with the purpose for which said indictment was offered as bearing on a possible motive."

With this instruction, the rights of a defendant are sufficiently safeguarded.

Jurors persisting in disregarding the instructions of the court, and in arriving at an unwarranted conclusion, such as that a person is guilty only because he has been indicted before he has been heard, are unfit to be jurors.

This will not be presumed.

We must presume that, to a reasonable extent, jurors are influenced by the instruction of the court and by limitations placed by the court on effect to be given to evidence.

A few pertinent citations are here inserted:

The following excerpt is from 1 Wigmore on Evidence, p. 390:

"The expediency of preventing the discovery of a former crime or of evading an arrest or a prosecution for it may lead to the desire to kill."

A fact may supply a motive. Stevens on Ev.

Some authorities have gone to the extent of expressing the view that an indictment is not rendered inadmissible although it has a tendency to prove a separate and distinct crime. Am. & Eng. Enc. (2d Ed.) vol. 11, pp. 512, 513.

The following cited decisions relate to different phases of evidence admitted to prove motive: State v. Russel, 33 La. Ann. 137; State v. Farrier, 114 La. 579, 38 South. 460; Schley v. State, 48 Fla. 53, 37 South. 518.

Juries should be extremely careful in weighing such evidence.

Considering the whole of the case, we have not arrived at the conclusion that the jury must have been unjustly and unfairly prejudiced against the accused. It would be otherwise if it were not for the instruction we have quoted above.

In passing from this point, we will state that it is not to be assumed that the indictment offered and admitted evidence that was foreign to the crime charged, and for which the defendant is prosecuted. If entirely foreign it is not to be considered; if it is not foreign, but germane, and has the appearance of showing motive, it is not to be excluded because it is apprehended that it will prejudice the cause.

This is the jurisprudence of this court. It is the jurisprudence of other courts.

Inquiry of defendant of a witness:

At the beginning in examining witnesses, McDermott, counsel for the state, announced, in answer to an inquiry by counsel for the defendant, that their purpose was to establish the fact that defendant "sought to obtain a confession."

This, it seems, is in some way connected with an anonymous letter, whether traced or traceable to the defendant the record does not disclose.

The fact which the state sought to prove, it may be, relates to another fact, connected with the issues of the cause. That was the position of counsel for the state.

If not connected, it may well be inferred

that the evidence was of no consequence; but, if connected, it formed a link in the chain of circumstantial evidence.

In other words, for the purpose stated by the prosecution, it was admissible, provided it was, as just stated, connected, for, if connected, it might throw light on the issues.

Generally, it is not difficult to establish that the fact is connected with the issues, and if it is not connected it is so declared by the court, and then the matter ends there.

It may tend to afford evidence, and that can only be determined by the trial judge after having heard the evidence.

There was no want of connection in this case with the crime charged. The purpose, as before stated, was to show motive.

So far as we know, the judge was not called upon by defendant to rule that it was not connected, nor does it appear that the judge did not instruct the jury in regard to circumstantial evidence, and the necessity of weighing it carefully from every point of view and of not giving effect to unconnected statements.

We have to assume, in the absence of objection, that a correct charge was given.

There is no good reason to sustain the next point in the cause, viz.:

The defendant was asked by counsel for the prosecution to spell the word "incorrigible." He refused. The court ruled that the question was legal. He persisted in refusing and in the end was excused for the reason before stated.

The prosecuting officer had a letter ostensibly written by the deceased with which he expected to connect the accused. The incorrect spelling in the letter was a clue, as he thought, whereby it would be, to some extent, shown who committed the crime.

It was a fact going to make up the chain of facts; it may have been a mere theory, or it may not.

There was no good reason not to answer the question propounded. It should have been answered.

He declined in the presence of the jury.

The jury retired.

The court ruled that defendant must decline to answer in presence of the jury. The jury returned into court. He then declined to answer.

The ruling was that he must decline to answer before the same authority before whom he had declined to answer the question when first propounded.

The jury was made aware of the fact. There was no secret about this fact. It was part of the cause susceptible of explanation. If he failed to give good reasons for declining, it was his misfortune. We can afford him no relief on that ground.

And, lastly, as before stated, an experiment was resorted to by the prosecuting counsel to contradict the defendant.

The facts connected with this experiment have been stated.

Experiments are sometimes made in criminal and civil cases. No exception arises in a case, though the purpose be to impeach a witness who testifies in his own behalf. Witnesses who testify in their own case may be impeached the same as any other witness. And any witness may be impeached by an experiment showing that he is mistaken in a statement that he has made or written.

The experiment as made presents no good ground to order another trial.

It only remains for us to state that there is abundant authority for such experiments. Abbott's Trial Brief, § 202, p. 491; People v. Levine, 85 Cal. 44, 22 Pac. 969, 24 Pac. 631; Goon Bow v. People, 160 Ill. 438, 43 N. E. 593; People v. Hope, 62 Cal. 291; People v. Levine, 85 Cal. 39, 22 Pac. 969, 24 Pac. 631.

It is not error to receive evidence of experiments. Abbott's Trial Brief, § 203, p. 493.

Not many years ago a distinguished lawyer lost his life while experimenting in a criminal case in the presence of the jury with a loaded pistol, which accidentally exploded while he was endeavoring to show that his client had not shot the pistol.

Experiments may also be made out of the courtroom, provided they are conducted only with the view of reproducing the conditions as those existing in the case, and provided they are properly conducted.

We have considered the different points brought up and argued in this cause. They present no issue sufficient in law to set aside the verdict.

With this, the duty—not always pleasant—is at an end. It only remains for us to affirm the judgment.

By reason of the law and the evidence being in favor of the state and against defendant, it is ordered, adjudged, and decreed that the verdict and judgment be affirmed.