MONItOE, ,C. J.
Defendant, having been convicted of murder and sentenced to be hanged, presents his case to this court upon certain bills of exception now to be considered:
Bill 1 was reserved to the overruling of an objection to the admission in evidence of the testimony of Warren Calogne, a state witness, to a confession alleged to have been made by defendant within a few hours after his arrest; the grounds of' objection being that a proper foundation had not been laid, and that, the confession having been reduced to the form of a typewritten instrument, that instrument was the best evidence. In reserving the bill counsel made all the evidence in the case part thereof, and there were added statements by the trial judge and district attorney, from all of which it appears that Detectives Obitz and Dodson, having been detailed to “run down a negro highway robber” who had been operating extensively in New Orleans, took their positions about 2:30 o’clock on Sunday morning, May 26, 1918, on Baronne street, near the corner of Calliope, and were seated upon the steps of a double tenement house which occupies the corner and fronts on Baronne street, with adjoining steps for each tenement, say, 10 or 12 feet below the corner and, resting on the banquette, Obitz being on the steps nearer to Howard avenue, and Dodson on those nearer Calliope street. According to the testimony of Dodson, who was the survivor and only living witness of the killing, they saw a negro coming from the direction of Howard avenue upon the same banquette, and as he came near them they arose and went forward in his direction; Obitz being a few feet in advance. As Obitz moved towards him, the negro began backing away and Obitz said to him, “This is the police.” The negro, who had his left hand in his pocket, thereupon “pulled a gun [meaning a pistol] out and fired two shots towards Obitz,” and turned and ran in the direction from which he had come, firing a third shot on his way, and the two detectives fired at him as he ran. There was no pursuit by them, as Obitz just then called to Dodson, “My God, Harry, I am shot!” and, falling to the pavement, died there. After Dodson had given some other testimony and left the stand, Calogne was called and testified that he had found defendant under arrest in the office of the chief of detectives *627 on the following Thursday May SOth, at about 2 o’clock a. m., and was with him. from then until after he had made his confessions, and that during that period no inducement to make them was offered to him, and no threat made, and that “he volunteered to show just exactly what had happened” upon the occasion of the killing. Counsel for defendant thereupon made an objection, and upon cross-examination of the witness elicited from him the statement that he did not-know what had happened to defendant prior to his (witness’) arrival at the headquarters. He was then asked by the district attorney how defendant came to make “this statement” when witness was there (it being assumed, apparently, that some statement had been made), and the witness replied that defendant had been speaking to Detective Greg-son while they were awaiting the arrival of Superintendent Mooney; that he arrived and questioned defendant as to several robberies “and as to this murder, the murder he had done”; whereupon counsel for defendant objected, the judge instructed the jury to disregard what had been said until he could determine whether the statement should go in as a confession, and ruled “that this whole evidence [intended to lay the foundation for the confession] should start with the police, and not with the witness,” and, the witness being for the time excused, the state called witnesses who testified as to the treatment defendant had received from the time of his arrest up to that at which Calogne had found him in the office, and thereafter until the confession here in question was made, and whether the confession was educed by any promise or threat, hope, fear, coercion, or- ill treatment. From that testimony it appears that on Thursday, May 36th, at about 1:30 a. m., Corporal (or Captain) Healey of the police force, with a squad of men, visited a house in New Orleans in which defendant occupied a room, the door of which (as we understand) opened on the banquette, but was found by them to be fastened upon the inside. Healey knocked, and, after the interchange of a few words with defendant, demanded admittance, and, upon its being refused, announced that he would break in the door, to which defendant (who was known to Healey as “Frank”) replied, “ ‘I am sitting here waiting for you to break that door in, and I’ll kill the first one’ — kill or shoot him, something like that;” and Healey testifies that he heard sounds indicating to him that defendant was probably handling a “gun” and cartridges. Healey then went to a nearby telephone and called for assistance, and on his return again demanded that the door be opened, to which the answer was, “There’s too many of yous out there.” Healey responded with a promise that, if the door were opened, he would see that defendant was not harmed; but about that time Detectives Gregson and Martinez, who had been working on the door, succeeded in breaking it in, or off, and they entered the room and made the arrest of defendant with a rush and with a reasonable expectation that, if they gave him time and opportunity, he would attempt to shoot them with the loaded pistol which at the moment of their entry he had in his hands. They, however, “jumped” on him quickly, and he laid the pistol on the chair upon which he had been sitting, and there was no shooting. Martinez admits that he struck at defendant, but it does not appear that he struck him, or that defendant then or at any time afterwards received the slightest, physical injury. A crowd had collected about the house and in the street, and there was a good deal of excitement, and probably some threatening language, since Healey testifies that he drew his pistol, and, standing with defendant behind him, warned the crowd that he must not be harmed and that there should be no firing, and within a few minutes defendant was taken out through *629 an alley, and, under the protection of Capt. Capo, put into the patrol wagon or automobile, and; accompanied by Capo, Gregson, and perhaps others, taken in safety to police headquarters. Arriving there, and awaiting the arrival of Superintendent of Police Mooney, defendant talked to Gregson (who remained with him from the moment of the arrest until after the confession here in question) until Calogne arrived, and to Gregson and Oalogne until Mooney arrived, and to the three until he was sent, accompanied by Gregson, to the precinct station (where he remained about 20 minutes), after which (as Calogne testifies) he “volunteered” to go to the scene of the killing and show how that tragedy was enacted. According to the testimony of the witnesses thus named, who account for all of the time between the arrest and the confession, defendant was never threatened or in danger, save at the moment and in the excitement of the arrest, and was not then or thereafter promised anything or coerced or ill-treated in any way in order to educe the confession, and, when the confession was made, was in entire control of his faculties and under no duress, save that he was in the custody of the officers of the law. Upon that showing the witness Calogne was recalled to the stand and interrogated as to the confession made at the scene of the killing, to which counsel for defendant again objected, that a sufficient foundation had not been laid, and that the best evidence of the confession was the type-written instrument representing the statement which defendant made upon his return from the scene of the killing to police headquarters in response to questions propounded by Superintendent Mooney, taken down by a stenographer and reproduced in that form, which objection having been overruled, the bill of exception No. 1 was reserved.
The statement per curiam attached to that bill reads as follows:
“As to the first objection, all the evidence introduced to lay the foundation for the introduction of the statement is incorporated in the transcript of appeal, and it satisfies me that the proper foundation has been laid, and that the statement was free and voluntary.
“In regard to the second objection, the record shows that the accused accompanied the officers and the witness to the scene of the shooting, and there described in detail everything that took place. This statement was not reported by a stenographer and not reduced to writing, and the evidence of the witness, who* was present and heard the statement, was therefore the best evidence. The district attorney had the undoubted right to show by the witness everything that was said at one time. Afterwards the accused made a statement at police headquarters which was reported by a stenographer and reduced to writing, but which was never offered in evidence, either by the state or the accused, and would have been inadmissible if offered by the state, as an examination of the statement will show. While there is no material difference between the statement at the scene as recited by the witness Oalogne and the subsequent written statement, as a matter of fact the defendant had the full benefit of the latter, which had been furnished his counsel by order of court, and it was used by him in his cross-examination of this witness, as will appear from the stenographer’s report of the trial in the record. The written statement referred to was offered in support of the motion for new trial, and is incorporated in the transcript. The district attorney has prepared a full and accurate note of what transpired on the trial in connection with the two objections above referred to, which note is annexed to this per curiam for reference. As the objection urged in bill No. 8 is the same as that presented by this bill, the above reasons are applicable to bill No. 8.
“[Signed] Joshua G. Baker, Judge.”
Emm the reasons which the district attorney assigns why the statement taken down by the stenographer was not and should not have been offered in evidence we make the following excerpt:
“In this signed statement the defendant is asked of his connection with various holdups. Some he admits; some he denies; and among those denied were some that the state had no evidence to show him guilty of; and among the holdups he is asked of and admits being guilty of were holdups committed after the *631 commission of the homicide, and therefore crimes which could not possibly have been introduced to show motive, or for any other reasons, as they were separate and distinct transactions, haying no bearing on the killing. In the opinion of the district attorney, to have admitted evidence of this kind against the defendant would have been reversible error. The trial judge could not legally have admitted it, and the.district attorney could not have asked to have it admitted.”
Calogne testifies that at the scene of the killing defendant assigned to him the role of the deceased detective, whilst defendant acted his own part, to wit:
“I was sitting on the steps that Obitz is supposed to have been sitting on, and as Bailey approached the corner I got up and walked within three feet of the curb. Bailey placed himself at a distance of about four or five feet from me, in that position— Q. * * * He told you to walk in his direction, and you reached three or four feet from Bailey, and then what happened? A. He told me to pull my hat down over my eyes, which I did. He then pulled his gun from his left pocket and fired, running towards Howard avenue. He ran a certain distance and fired again, and the two men who were on the corner returned the fire. Q. Now, you were sitting on that step at the instance of this defendant, and he thus illustrated to you and demonstrated to you what had occurred on that corner, even as to pulling down the hat? A. Yes, sir. Q. Did he say fhat anything was said to him at all before he fired? A. He said that he was ordered to halt.”
After the demonstration Superintendent Mooney, Calogne, and possibly one or two others, were shown by defendant over the route he had taken in making his escape. They then returned to police headquarters, where defendant was subjected to the further examination to which we have referred, which was reduced to the form of a typewritten instrument, and, in the course of which he admitted a number of highway robberies, armed with a loaded pistol, some committed within the two days preceding the killing of Obitz, and others within a day or two afterwards, and as to the killing as follows:
“Q. And then you did know that there was a man shot and killed there; that he was a policeman? A. I heard some one got killed on Calliope and Carondelet streets, while the man that was killed was on Calliope and Baronne streets. Q. And the man that killed him was you? A. Yes, sir. Q. Do you know Detective Obitz? A. Yes, sir. Q. He is the man that you killed? A. Yes, sir. Q. Did you recognize him that night? A. No, sir; both of them 'had their hats over their eyes, and, if they had been dressed in uniform, and if he would have shot me on his beat, I would have knew who he was, but by his coat being buttoned up and his hat over his eyes I did not know' him. * * * Q. But you admit firing shots at the two men who were sitting on Baronne and Calliope streets? A. Yes, sir; both of them made the first shots; they fired first. Q. How many shots? A. About five apiece. Q. How many did you fire? A. I fired three and broke and ran. * * * Q. Did these men cover you with their guns? A. Yes, sir; at first he said, ‘What you got?’ and I didn’t know who he was. If he would have said, T am a detective,’ it would be all right. Q. Did you fire the shots with your right or left hand? A. With my right hand.”
[1, 3] We concur in the conclusion reached by the trial judge that the testimony offered to lay the foundation for the introduction of the confession that was received in evidence-shows that the confession was induced by neither promise, threat, nor duress, and hence was to be regarded as free, voluntary, and admissible. Beyond that we find nothing that was said or done to the defendant or in the condition in which he found himself which suggests any sufficient reason why he should have admitted that he was guilty of a capital offense, and have illustrated in detail the manner in which it was -committed, if such admission were not founded on the truth. To the contrary, his information as to the details of the affair, and his consequent ability to direct their demonstration, would seem, when compared with the story told by Dodson, the only (other-) surviving eyewitness, *633 to establish beyond all doubt tbe verity of tbe story told by him. It is true that tbe two stories differ upon tbe question of what was said by tbe deceased officer before tbe firing began, and as to tbe persons by whom and order in which tbe shots were fired, but, tbe foundation for tbe admission of the confession having been properly laid, and tbe confession admitted, those were questions of fact and of the credibility of witnesses, to be determined by tbe jury, if presented to it; and that they were presented is shown by the record. Thus, after the admission of the •confession offered by the state, it was open to defendant, though not to the state, to offer the instrument containing the later confession, including defendant’s statements as to the questions above mentioned; and in that case it would have been for the jury to choose between those statements and the testimony of Dodson and Oalogne, the one testifying to what he had seen and heard on the spot at the time of the killing, and the other as to what he had heard defendant confess. Defendant was not advised to offer his later confession, but his learned counsel nevertheless brought out the fact that he had therein made the statements to which we have referred: Thus his cross-examination of the witness Oalogne upon that point reads:
“Q. Do you remember bis saying, in answer to Chief Mooney’s questions, this: ‘And as they got up one of them pulled out his gun and said, “Hold up!” I said, “Por what?” and I didn’t know who they were; they were in citizen’s clothes; and as I started to hold my hands up he fired three shots, and I broke and ran, -and the other man shot at me, and I took it they were trying to hold me up, and I fired three shots. Q. Did this man fire at you? A. I don’t know; he had his hat pulled over his eyes when I came along.’
“Q. (by counsel, to Cologne;. Did you hear him make that answer? A. Yes, sir.
“Q. (reading from confession). ‘About how •many did they fire? A. It looked like they shot about five apiece at me.’
“Q. (to Cologne). Did you hear him make' ‘that answer? A. Yes, sir. * * * Q. Now, did you hear him make those answers, as I have read them to you? A. To say that the reading is exactly as he said it, that is a little hard for me to remember, but Superintendent Mooney asked Bailey those questions, and Bailey answered them. Q: And Mr. Phelps, the stenographer, took them down in shorthand, as Bailey answered them? A. Yes, sir.”
So that, without offering his later confession (containing his admission as to highway robberies committed by him before and after the killing of Obitz), defendant was able to put before the jury so much of that confession as appeared to sustain the defense upon which, as it seems, he was, and is now, relying, to wit, that his attempted arrest was made in so wanton and menacing a manner as to threaten him with loss of life or 'with great bodily harm, and to warrant his exercise of the right of self-defense to the extent of taking the life of the officer. On the other hand, there was interwoven with the statement that was repeated by the counsel to Oalogne and testified to as having been made by the defendant the further statement to the effect that defendant did not know the detectives, and took it that they were holding him up, and, so far as the prosecuting officer could know, defendant might have been pitching his defense upon the ground that he thought he was defending himself against highwaymen. It remains, therefore, that by the cross-examination of Oalogne he made known to the jury so much of his later confession as was thought advisable, and that he was not called on, nor was Oalogne, to give any further information concerning the contents of that instrument.
We have considered the cases to which our attention is particularly directed as sustaining tbe view that the confession relied on by the state should have been excluded, and do not find them applicable to the case here presented.
In State v. Gianfala, 113 La. 463, 37 South. 30, it appeared that the defendant and one *635 Roslieger became engaged in a figbt; that Rosheger’s wife had gone to the telephone office, probably, to call assistance; that in the meanwhile a pistol had been discharged and Rosheger had been shot and carried back into his house (in front of which the fight occurred), that a big crowd had gathered, and defendant was being held by a member of it when Rosheger’s wife returned and found ■her husband mortally wounded; that she thereupon (quoting the language of the court) “jumped on Gianfala, in an access of fury, ‘and clawed him and bit him and tore his clothes,’ and it was while this was going on that the statement sought to be introduced as a confession was made, namely, Mrs. Rosh-eger said to Gianfala, ‘You killed my husband,’ and he answered, ‘You called my wife a s-of a b-.’ ” It was held that Gian-fala’s answer was neither a confession nor part of the res gestee.
In State v. Alexander, 109 La. 557, 33 South. 600, it appeared that defendant was in prison charged, with two others (one of whom, named Payne, had not been arrested), with murder; that he was there visited by the chief of police, a police officer, and the jailer, and, in answer to his question whether Payne had been arrested, was told by the chief of police, “No; as soon as he is caught, he is going to turn state’s evidence, and, if you have got anything to say, you had better say it now.” Held that the confession so obtained should have been excluded.
In State v. Nelson, 3 La. Ann. 500, the confession was made by a slave to his master, who was also his overseer, and who had advised him “that it would be better for him to tell what he had done.” Held that the confession should have been excluded.
■And other cases ar.e cited in which it appeared that the defendants were advised by persons in authority that it would be better, for them to confess, and like rulings were made.
In State v. Albert et al., 50 La. Ann. 481, 23 South. 609, defendant testified that while he was in jail two deputy sheriffs, in presence of the sheriff and another person, showed him a scaffold (admitted to have been left standing in the jail yard) and told him that they were going to hang him on it, and one of the deputies gave the following testimony:
“Q. Did you not say that, with a view of exhorting a confession from Paul Albert, you had tightened the handcuffs on his wrists? A. I said I had put them on pretty tight. Q. What was the purpose of putting them on tight? A. I thought maybe if I put handcuffs on him a little tight he would tell me the truth.”
In State v. Auguste, 50 La. Ann. 490, 23 South. 612, the defendant was charged in the same indictment for the same offense as the defendant in the case just referred to.
“He had been arrested,” said the court, “by one of the deputies, handcuffed, and brought to prison. He is sent for by this deputy a few days later, taken under the shadow of the standing gallows,” upon which recently a murderer had been executed, “to a room in the jail and there confronted by this deputy, in the presence of the sheriff and two other deputies (one of them presumably the jailer), and told he must tell the truth in regard to the robbery * * * He [the deputy] demanded to know ‘when they had robbed the store, and how often they had robbed it,’ and while it has been held that a prisoner’s confession will not be rejected as evidence merely because it was made in answer to a question which assumed his guilt, * * * the answers thus compelled of the accused in the instant case, under the circumstances mentioned, cannot be received without doing violence to the rule that confessions, to be admissible, must be free and voluntary.”
In State v. Berry, 50 La. Ann. 1309, 24 South. 329, it appeared that the defendant was arrested by a constable, who leveled a gun at him, ordered him to hold up his hands, and then tied him, and that it was while he was so tied that he made the confession that he had done the killing for which the arrest was made. The court quotes authority as to the law applicable to such cases and *637 finds no basis for bolding that the proceedings, the verdict, and the sentence were not in accordance with law and the evidence.
In State v. Young, 52 La. Ann. 478, 27 South. 50, defendant (accused of a crime for which men are more frequently lynched than for any other) made a confession with a plow line around his neck and surrounded by a mob who were seriously considering the question of hanging him. It was held that the confession should have been excluded.
In State v. Maimee Alphonse et al., 84 La. Ann. 19 (not cited for defendant), it appeared that, defendant having been arrested, the officer making the arrest said to him, “Maimee, don’t cry; I would not cry if I was not guilty; you would do better if you told me who the parties areand after he had been put in a cell he called the officer back and the officer said to him, “Now, remember, if you know the parties, you had better tell me; I would not suffer for any one else;” after which, defendant made a confession, which was admitted by the trial court and held by this court to have been properly admitted. In considering the underlying principle upon which the exclusion of confessions is held to rest, viz. that, by reason of inducements of hope or fear, or of duress, confessions in particular cases may be untrustworthy as evidence, the court said (34 La. Ann. 17):
“It is difficult to deduce any positive rule on this subject from the decisions, which, as stated, are not uniform, for the reason that in each case the question is whether the influences applied in that case were likely to produce untruth — a question which rests to a considerable extent on the discretion of the judge who is called on to decide it.”
In the instant case the truth of the confession offered by the state is conceded in so far as the killing is concerned. Defendant attacks its verity with respect to a certain detail wherein it differs from a subsequent confession, but the jury, to which the decision of that question belonged, has decided it adversely to defendant’s contentions, and its decision, so far as this court is concerned, is final.
[2] Considering the other ground of exception reserved in bill 1, it is true that, if defendant had made but one confession, and it had been reduced to writing, the written instrument would be the best evidence of the matters confessed; but that was not what happened. The confession offered by the prosecution purports to include all that was said on that particular occasion, and was not reduced to writing. As to it, therefore, the best evidence was the testimony of those by whom it was heard; and that testimony was none the less admissible because defendant made another confession, at another time and place, which was reduced to writing. We are inclined to the opinion that he would have been entitled to introduce that writing in evidence, but we are also inclined to the view that it was more to his advantage that his counsel proceeded as he did. Bill 8 presents the same questions as bill 1, and our conclusions concerning it are the same.
Bill 2 was reserved to the overruling of an objection to the testimony of C. P. Lowe, identifying defendant as a person who on the morning of May 24, 1918, between 2:15 and 2:30 o’clock, held Lowe up at the point of a pistol upon a public highway not far from the place where Obitz was killed, and robbed him of a watch and chain and a small knife, which watch he thereafter saw in the office of the chief of detectives. The ground of the objection was that the offer of the testimony was an attempt to prove a collateral offense for which there had been no prosecution and no charge, and that such proof could only serve to prejudice the jury with respect to the charge of murder upon which defendant was being tried.
In his statement attached to the bill the *639 trial judge points out that Obitz and Dodson had been detailed to arrest a negro highwayman, a description of whom had been furnished them, but of whose name they were ignorant; that they were stationed at Ba-ronne and Calliope streets about 2 o’clock in the morning; that they observed a negro approaching, and when he had come within about 10 feet of them they arose from their seats and advanced towards him, and that he moved backwards; that Obitz said, “This is the police,” and that defendant immediately fired and mortally wounded him; that both detectives returned the fire, but that defendant escaped; that, while defendant did not take the stand as a witness on the trial, he had previously stated to Superintendent Mooney and the witness Calogne that he did not know who the men were that he fired upon, and that he fired because they were trying to hold him up.
“Evidence of robberies committed by the accused shortly before he killed the officer while attempting to arrest him,” the statement of the judge continues, “was offered and admitted to show that his motive for the killing was to avoid being arrested for those robberies. Under the circumstances I was satisfied, as already stated, that the evidence was admissible for the purpose -for which it was offered and comes clearly within the exception to the rule excluding proof of separate and distinct offenses to the one charge.”
And the ruling so made is applied to bills 3, 4, 5, 7, and 9 as well as to bill 2.
Counsel _ for defendant contends (in his brief) that such evidence is admissible only in rebuttal; that—
“In this case it was not attempted to make the defense that the accused thought he was being held up and had mistaken the police officers for highwaymen, nor was any attempt .made to show that defendant did not do the shooting while trying to avoid arrest. On the contrary, the only evidence on the point discloses that, when he was accosted by the officers, in citizen’s clothes, he was notified' that they were police officers, and therefore had notice of their character and official authority.”
“It is true,” the brief continues, “as the judge a quo states in his per curiam, that the witness Calogne testified that accused told him that he thought he was being held up; but this answer was obtained from a bitterly hostile witness in response to a question from the court, and was not produced and could not be controlled in any manner by defendant or his counsel, and was no part of the defense.”
[4] The testimony of Calogne as to what defendant said in his later confession was developed in the cross-examination by defendant’s counsel,' conducted as hereinbefore appears; and, waiving the question whether it would not have been admissible in chief, justified the introduction by the state of the evidence in question as tending to show, in rebuttal of defendant’s statements to the contrary, that in firing as and when he did’ he was actuated by a desire to escape lawful arrest for crimes of which he knew that he was guilty, rather than to protect himself from an unlawful attack. 16 C. J. p. 600, § 1165; State v. Fontenot, 48 La. Ann. 307, 19 South. 111; State v. Johnson et al., 111 La. 936, 36 South. 30; State v. Anderson, 120 La. 331, 45 South. 267; State v. McKowen, 126 La. 1075, 53 South. 353; State v. Jones, 145 La. 340, 82 South. 362; Moore v. U. S., 150 U. S. 59, 14 Sup. Ct. 26, 37 L. Ed. 996; O’Brien v. Com. (1903) 115 Ky. 608, 74 S. W. 666; People v. Pool, 27 Cal. 572; McConkey v. Com. (1882) 101 Pa. 416; People v. Woods, 147 Cal. 265, 81 Pac. 652, 109 Am. St. Rep. 151; People v. Governale, 193 N. Y. 581, 86 N. E. 554; Wellington v. Com., 158 Ky. 162, 164 S. W. 333; People v. Wilson, 117 Cal. 688, 49 Pac. 1054; People v. Morse, 196 N. Y. 306, 89 N. E. 816; Whart. Cr. Ev. (10th Ed.) vol. 11, § 899.
Bills 6 and 10 are not here insisted on, and need not be discussed. Finding no error therein, the verdict and sentence appealed from are affirmed.
O’NIELL, J., having concluded from the evidence that the confession made by the *641 defendant was induced by fear and by persistent questioning by tbe policemen or detectives wbo bad bim under arrest, dissents from tbe ruling that tbe confession was free and voluntary; and be dissents also from tbe ruling that tbe evidence that tbe defendant bad committed several other crimes on other occasions, referred to in bills No. 2, No. 3, No. 4, No. 5, No. 7, and No. 9, was admissible, even for tbe purpose of proving a motive for tbe billing of tbe detective Obitz.